Argued and submitted January 19, reversed May 24, 2000

In the Matter of
Jacara Murelle Ahlgren-Stillman, a Minor Child.

STATE ex rel STATE OFFICE FOR
SERVICES TO CHILDREN AND FAMILIES;
Jacara Murelle Ahlgren-Stillman;
and Laura Ahlgren,
*Respondents,*

*v.*

Donald E. STILLMAN,
aka Donnie Stillman,
*Appellant.*

(96-276J)

In the Matter
of Keith Alexander Stillman, a Minor Child.

STATE ex rel STATE OFFICE FOR
SERVICES TO CHILDREN AND FAMILIES;
Keith Alexander Stillman;
and Laura Ahlgren,
*Respondents,*

*v.*

Donald E. STILLMAN,
aka Donnie Stillman,
*Appellant.*

(96-25J; CA A107034)

1 P3d 500

James A. Palmer argued the cause and filed the brief for appellant.

Denise G. Fjordbeck argued the cause for respondents. With her on the brief were Hardy Myers, Attorney General, and Michael D. Reynolds, Solicitor General.

Before Landau, Presiding Judge, and Deits, Chief Judge, and Kistler, Judge.

KISTLER, J.

Deits, C. J., dissenting.

**KISTLER, J.**

Father appeals from a judgment terminating his parental rights to his two children. We reverse.

Before 1990, father had been convicted twice on drug charges. He enrolled in a drug treatment program and met mother, who was also enrolled in the program. The couple's daughter was born in June 1991. Sometime after their daughter was born, mother started drinking and father began using methamphetamine again. When mother learned that she was pregnant with their second child, she entered a second treatment program. Father, however, continued his drug use. The couple's son was born in February 1993.

The State Office of Services to Children and Families (SCF) first contacted mother and father in August 1993 as the result of a referral.[1] When the SCF caseworker went to the family's home to investigate, mother appeared to be under the influence of intoxicants and the children were unsupervised. Father was not home, but he met with the caseworker the next day at her office. At that time, father would not recognize that mother had a substance abuse problem that interfered with her ability to care for the children, nor would he accept the services offered by SCF. Father told the caseworker that he would monitor the problem and that if the children were at risk, he would not go to work. SCF took no further action at that time.

Despite father's assurances that he would monitor the problem, on at least one occasion he left the children in mother's care even though he believed mother had been drinking. Father also took no action after other family members told him that mother had been driving under the influence with the children in the car and that she had left the baby in a crib all day after passing out from drinking. At one point, father obtained a restraining order against mother, but they reunited approximately a month after the restraining order was issued.

Despite his drug use, father maintained regular employment with a construction company until 1995. After

---

[1] The referral stated that mother was not supervising the children.

leaving his work, father began manufacturing and selling methamphetamine. In May 1996, police officers raided the family's home. They found methamphetamine in a bedroom. The officers also found equipment and chemicals used to manufacture methamphetamine in the garage. One of the officers testified that the methamphetamine in the bedroom was accessible to the children and that the methamphetamine lab presented a health hazard to the occupants of the home. There was evidence at trial that the daughter had seen one part of the methamphetamine manufacturing process.

In November 1996, SCF filed petitions to terminate both mother and father's parental rights. The termination hearing was postponed, however, because "[m]other appear[ed] to have made significant progress and further assessment [was] necessary." At the same time that SCF was deciding whether to proceed with the termination of mother and father's parental rights, both parents were facing criminal charges as a result of the discovery of the methamphetamine laboratory in their home. According to father, he agreed to plead guilty in return both for a lesser sentence and a promise that the charges against mother would be dropped. Mother agreed that it was his goal to keep her out of jail so that she would be available to care for the children. Pursuant to the plea bargain, father was convicted in federal court in April 1997 for possessing a precursor chemical used to manufacture methamphetamine and for the intent to manufacture methamphetamine.

In September 1997, SCF developed a plan to return the children to mother. By January 1998, mother was making progress in treatment, and it appeared that she could be a resource for the children. At SCF's request, the court dismissed the petitions to terminate both mother and father's parental rights. By March 1998, however, SCF received reports that mother was again using drugs. Mother tested positive for, and admitted using, methamphetamine. As a result, in August 1998, SCF filed a second round of petitions to terminate mother and father's parental rights. In response to those petitions, mother executed a stipulated judgment

terminating her parental rights.[2] Accordingly, the evidence at trial focused solely on father.

The evidence showed that, after the May 1996 raid of his home but before being incarcerated in federal prison in October 1997, father enrolled in a program with the Lane County Addiction Counseling and Education Services (ACES). Initially, father stated that he had enrolled in the ACES program to avoid spending more time in prison. One of father's counselors in the ACES program testified that, although father's initial motivation—to avoid a long prison sentence—was external, father later became more internally motivated. In early 1997 father tested positive for drugs while enrolled in the program. Notwithstanding that single relapse, father successfully completed the ACES program.

One of his counselors wrote that father had come to her and asked for more help, apparently after the relapse. She explained: "That was the needed boost that he required. He has done an excellent job in his treatment since that time in May of 1997. He has a thorough grasp of what is needed in order for him to continue a recovery lifestyle. My prognosis for him and his future is quite positive." She also stated that father "was the most successful client [she had] ever worked with. He's a counselor's dream. It's my estimate that he will be helping inmates with recovery when he's in prison."

On cross-examination, SCF's attorney questioned whether father was simply focused on his own needs. The counselor answered, "It was always my impression that [father] cared deeply about his children and his family and that he was interested in changing and improving his own life situation with the hope that he could and would have a healthy family." When SCF's attorney pressed the point again, the counselor replied:

> "Well, I can't speak to what might have been going on in [father's] head, only to my impressions. And my impression was that, he wanted his children, he grieved over being separated from his children, he frequently talked about his

---

[2] According to the terms of mother's stipulation, if the termination of father's parental rights is not upheld on appeal, mother can move to vacate the stipulated judgment.

children and his sense of obligation as a parent and as a father and the kind of father that he wanted to be for his children, and being separated from them was difficult. And it's—I guess it's my impression that if he had any genuine ability to make the situation anything different, that he would want to be with his children, living with his children, raising his children."

In addition to completing the ACES program, father voluntarily took and completed a parenting class through the Relief Nursery before reporting to prison. In that class, his "attendance and participation throughout the months this class was conducted w[ere] excellent. He demonstrated a sincere commitment to learning from the material being shared [and] was supportive of other group member's experience[.]"

While in federal prison, father completed a required 40-hour drug class. Also, with the help of volunteers who visited the prison, father worked to initiate and develop a 12-step narcotics or alcoholics anonymous program in prison. At the time of the termination hearing, in addition to the 12-step program, father was participating in a 500-hour program for substance abuse. While incarcerated, father chose to quit smoking even though smoking is permitted in federal prison. Father explained that he quit smoking because his children asked him to and he wanted to do it for them. In addition to the drug programs, father took a parenting class, a human sexuality class, and a real estate class while in prison, all to become a better parent for his children.

The instructors in the federal prison uniformly praised father's efforts to improve himself. On the final grade sheet in father's parenting class, the instructor wrote that father "was an excellent student" and that "his positive outlook and enthusiasm served as a model for other students." Father's real estate instructor wrote a letter on father's behalf stating that father "is one of the few that deserves recognition for his devotion to his family and his future in [s]ociety." Additionally, because of his good behavior while in prison, father worked outside the prison on a forestry work crew.

At the June 1999 termination hearing, SCF did not present any psychiatric or psychological evidence about

father's present ability to be an adequate parent. Rather, it offered a report of a psychological evaluation that Dr. Robert Basham had prepared more than two years earlier in February 1997. Basham also answered hypothetical questions based on his 1997 evaluation of father. In his report, Basham stated that father has "generally good intellectual abilities, and he has the basic potential to use good judgment. The psychological tests did not reveal any significant problems, other than his drug dependency (which he readily acknowledges)." Basham added: "Chemical dependency is the primary psychological problem that would impair his ability to function as a parent, so his status in recovery is crucial in terms of case planning for the children."[3] In his recommendation, Basham stated: "[I]f [father and mother] are able to show ongoing recovery and if they are able to demonstrate good involvement in services and maintain their ongoing recoveries, there is a reasonable prospect that they could continue raising the children successfully."

As noted above, Basham was asked a series of hypothetical questions at trial because he had not spoken with father since February 1997. When asked whether the fact that father had stayed drug free in prison was significant, Basham replied "[t]he fact of staying free of drugs while incarcerated really says nothing about long-term prospects [for staying drug free]." On cross-examination, father's counsel provided Basham with additional information in the form of hypothetical questions about what father had done while in prison in addition to staying drug free. When asked if it made a difference that father had also completed two drug programs in the penitentiary (one of which involved 500 hours of work), had completed a parenting class at the Relief Nursery, had voluntarily quit smoking, had "voluntarily started up an AA or an NA class in the penitentiary" and had become a leader in the class, had learned to work with counselors and had fully cooperated with SCF through the course of the 1999 termination proceedings, Basham acknowledged

---

[3] Basham also noted that father "does not appear to have a full antisocial personality disorder, but does have some issues with authority and resentments about how he has been treated." Basham accordingly noted that father had antisocial personality traits. He observed that the presence of those traits is a negative prognostic sign that father will remain free from drugs after he is released from prison.

that it "certainly could." Although Basham raised the possibility that father's actions in prison might have been "done to look good to others," he candidly acknowledged that it was impossible for him to "make that diagnosis" in 1999 since he had not seen father for more than two years.

Between the time of the police raid in 1996 and the termination hearing in June 1999, father's two children were placed initially in a shelter home and then in foster care with their former step-grandmother (father's former mother-in-law). During that time, they were also involved with other members of their extended family. The clinical social worker testified that the children's extended family had meant a lot to them and "ha[d] really kept them as healthy as they are." Although the social worker testified that the children needed permanency, predictability, and stability in their lives, she explained that "they're doing very well by comparison [to other children who have been in foster care for the same length of time]."[4]

The social worker also testified "these children are attached to their parents. I think they love their parents." She explained, "I think that they would, if they could have what they wanted, they would be back with their parents and their parents would be able to take care of them." Before father was incarcerated, he and mother visited the children for two hours three times a week and were allowed to have extensive phone contact.[5] Generally, the visits went very well with only minor difficulties. After his incarceration, father consistently wrote letters to his children and maintained his interest in them. At the time of the June 1999 hearing to

---

[4] The social worker acknowledged that on November 2, 1998, she had told the Court-Appointed Special Advocate

"the children are in a good, stable home, are feeling secure about being there. [The social worker] feels like [daughter] is a little parentified, not too badly, though, and that she does the worrying for the two. That [son] basically follows her lead and is concerned when she's concerned. Overall though, she thinks the children are doing really well."

[5] A SCF social service specialist testified that this is much more visitation than most of SCF's clients have. The reason for such extensive visitation was that the foster parent was able to supervise the visits and because SCF had received positive reports about the parents from Relief Nursery and from Head Start, where the children had been enrolled before the parents' arrests in May 1996.

decide whether father's parental rights should be terminated, he was due to be released from prison in approximately four months. Following his release, he expected to be in a halfway house in Eugene, which would prevent him from taking custody of the children immediately. He accordingly understood that the children might remain in foster care for as long as a year while he got a job and provided a house for them. He also recognized that he would need SCF's approval before the children could be returned to him.

At the termination hearing, the representative for SCF explained that she had "not spoken to any of [father's] treatment providers" in the penitentiary about his progress there. Rather, she testified that SCF "is not willing to consider him and is not able to consider him as a resource for his children because he is incarcerated. What the children need is permanency." She explained: "Well, as Dr. Basham stated, because he's undergoing services in prison, that's not a demonstration of his ability to remain clean and sober once he's out. And therefore, it's the agency's position [that it is] in the best interests of these children not to continue to wait any longer as they've already waited for three years."[6]

Following the termination hearing, the trial court agreed with SCF that the children need permanency now. The trial court found that father's belief that making the children wait a few more months will not harm them "is an example of father's continued inability to put the children's needs ahead of his own." The trial court was also unconvinced that father would remain drug free after his release from prison and concluded that "the fact of father's continued incarceration and the high likelihood that he will relapse pose an unacceptable risk to the mental and emotional well being of the children." The trial court accordingly terminated

[6] SCF's representative appears to have placed too much reliance on Basham's testimony in two respects. First, Basham did not say that the fact that father was undergoing services in prison is no indication that he will remain clean and sober when he is released. Rather, Basham testified in response to a hypothetical question that the fact that father had remained clean and sober in prison was not a reliable indicator. When Basham answered that question, he had no information about either the programs in which father had participated while in prison or his counselors' assessment of his progress. Second, Basham testified that he could not offer an opinion on father's prospects once he was released because he had not seen him in more than two years.

father's parental rights and committed the children to the permanent care, custody, and control of SCF.

■ On appeal, SCF argues that the trial court properly terminated father's rights under ORS 419B.504 (1997).[7] That statute authorizes termination if "the parent or parents are unfit by reason of conduct or condition seriously detrimental to the child and integration of the child into the home of the parent or parents is improbable within a reasonable time due to conduct or conditions not likely to change." Textually, the statute requires a court to answer two related but separate questions. The first is whether a parent is presently unfit by reason of conduct or condition that is seriously detrimental to the child. *State ex rel Juv. Dept. v. Johnson,* 165 Or App 147, 156, 997 P2d 231 (2000); *State ex rel SOSCF v. Burke,* 164 Or App 178, 186-87, 990 P2d 922 (1999); *State ex rel SOSCF v. Wilcox,* 162 Or App 567, 573, 986 P2d 1172 (1999). If the parent is presently unfit by reason of conduct or condition, a court must ask whether that conduct or condition makes it improbable that the child can be integrated into the parent's home within a reasonable time. *See id.* In determining whether integration can occur within a reasonable time, the focus is on the child's "emotional and developmental needs and ability to form and maintain lasting attachments." *See* ORS 419A.004(17); *State ex rel SOSCF v. Duncan,* 164 Or App 610, 613-14, 993 P2d 818 (1999). If the parent is presently unfit and integration is not probable within a reasonable time, the final question is whether termination is in the child's best interests.[8]

---

[7] In its petition to terminate father's parental rights, the state alleged two statutory grounds for termination: (1) that father was unfit, *see* ORS 419B.504 (1997) and (2) that he failed or neglected without reasonable and lawful cause to provide for the basic physical and psychological needs of the children for six months before the petition was filed, *see* ORS 419B.506 (1997). The trial court found only that father was unfit under ORS 419B.504 (1997). On appeal, SCF has not argued that father failed or neglected to provide for the children's basic physical and psychological needs for the six months before it filed the petition to terminate father's parental rights. We accordingly limit our analysis to the question whether father is unfit under ORS 419B.504 (1997).

[8] SCF must prove each statutory element by clear and convincing evidence. We review the record *de novo,* ORS 419A.200(5), although we give " 'considerable weight' to the [trial] court's findings on issues of credibility," *Burke,* 164 Or App at 187.

■ The initial issue is whether father is presently unfit by reason of conduct or condition that is seriously detrimental to the children. *See* ORS 419B.504; *State ex rel SOSCF v. Armijo*, 151 Or App 666, 681, 950 P2d 357 (1997). SCF advances two grounds for saying that he is. It argues initially that father's incarceration makes him unfit. As SCF recognizes, however, we have consistently held that incarceration alone does not warrant a finding of unfitness, although a prolonged period of incarceration will warrant such a finding. *Compare State ex rel Juv. Dept. v. Jenkins*, 59 Or App 702, 707, 651 P2d 1374 (1982) (finding that father was not unfit even though he was incarcerated for a substantial period), *with State ex rel Juv. Dept. v. Kenneth M.*, 27 Or App 185, 555 P2d 933, *rev den* 276 Or 873 (1976) (terminating parental rights of father serving life sentence for murdering children's mother). In this case, father had four more months left on his federal sentence when the trial court was asked to decide whether his parental rights should be terminated.[9] Additionally, he will have to spend some time in a halfway house before he will be in a position to care for the children. We have never held that such a relatively short period of separation made a parent unfit. We decline to do so here.

■ SCF also appears to argue that father's substance abuse makes him unfit as a parent. It is certainly true that before 1996, father had a long and persistent history of drug use. That drug use led to and resulted in the neglect of his children. Had SCF moved to terminate father's parental rights in 1996, the record suggests that SCF would have been successful. However, because of its efforts to rehabilitate mother, SCF waited for several years before seeking to terminate both parents' rights. By the time the termination hearing took place in June 1999, father had made significant progress toward turning his life around and resolving the single issue—his use of illegal drugs—that had prevented him from being a good father to his children. As Basham concluded in his February 1997 psychological report, "if [father is] able to show ongoing recovery and if [he is] able to demonstrate good involvement in services and maintain [his]

---

[9] We recognize that father had been incarcerated for approximately three years before the termination hearing began. The question, however, is whether he is presently unfit by reason of his incarceration.

ongoing recover[y], there is a reasonable prospect that [he] could continue raising the children successfully."

Since 1997, father has done all that Basham asked. He has participated in numerous programs. He has demonstrated good involvement in services; he has maintained his ongoing recovery; and he consistently has received high praise from all of the treatment providers who have worked with him. SCF, however, argues that we should discount father's progress. It notes that his former mother-in-law testified that father "knows what people want to hear, he knows the right thing to do, [and] he knows the right thing to say." His former mother-in-law explained that "most of the time he believes [what he is saying]. But he just doesn't seem to be able to make it happen." SCF also argues that father's "pattern of relapses into substance abuse treatment" calls into question the possibility that he will continue to stay drug free after his incarceration.

We address SCF's last point first. The evidence in the record shows two relapses either after or during treatment. Father was in a treatment program when he met mother in 1990, and both of them relapsed after they began their relationship. That relapse continued until father was arrested in 1996. The record does not disclose any details about the first treatment program, the length of time father participated in it, or his prognosis after he completed treatment. The second relapse occurred while father was in the ACES program. After a single positive urinalysis, father sought increased help and the counselor who worked directly with father concluded that "[t]hat was the needed boost that he required. He has done an excellent job in his treatment since that time." The record does not disclose any other relapses after treatment. It does, however, disclose that after the single relapse while he was in the ACES program father's progress has been exemplary.[10]

SCF also relies on the testimony of father's former mother-in-law to show that although father may be saying the right things to his treatment providers, he will not be able

---

[10] We note that to the extent mother's substance abuse has contributed to father's, father testified that he has no wish to remain in their marriage and wants to raise the children on his own.

to carry through with his plans. However, the professionals who worked with father, and countless other substance abusers, found father's progress exemplary. In their professional judgment, father had accomplished what few other persons in his position had. SCF provided no evidence that directly contradicted those persons' assessment of father's accomplishments. Indeed, Basham testified that he could express no opinion on whether father's progress was genuine, as the professionals believed, or insubstantial, as father's former mother-in-law apparently believed. We appreciate the dissent's concern that father may relapse. We cannot say, however, that SCF has proven by clear and convincing evidence that father's prior drug use makes him presently unfit. As we explained in *Armijo*, 151 Or App at 679-80, the point is not that we are certain that father will succeed. Rather, the record does not show, by clear and convincing evidence, that he will not. In light of father's considerable efforts to become a better parent, father is entitled to a reasonable opportunity to show that those changes are permanent. *See State ex rel CSD v. Rollins*, 136 Or App 7, 13, 900 P2d 1072 (1995), *adhered to* 140 Or App 222, 914 P2d 1094 (1996).

On this record, neither father's incarceration nor the possibility of a relapse provides clear and convincing evidence that father is presently unfit under ORS 419B.504 (1997). *See Rollins*, 136 Or App at 13-14. Accordingly, we need not decide whether the conduct or condition that makes father unfit also makes integration of his children into his home improbable within a reasonable time. *See* ORS 419.504 (1997); *Wilcox*, 162 Or App at 573. Although father's parental rights should not have been terminated, that conclusion does not mean that his children must be returned immediately to him. *See Rollins*, 136 Or App at 14. As we explained in *Johnson*, while working toward returning the children to father, SCF may take appropriate action if intervening events warrant such action. 165 Or App at 161.

Reversed.

**DEITS, C. J.,** dissenting.

I agree with the majority that, while he has been in prison, father has made significant efforts to combat his drug addiction and that he has, in fact, been a model prisoner in

many ways. I do not agree, however, with the majority's conclusion that father's efforts are sufficient to justify exposing his children to the risk of suffering a continuing indefinite period of instability in their lives. Therefore, I respectfully dissent.

As the majority correctly explains, our task on *de novo* review is to determine whether the state has proven by clear and convincing evidence that father is presently unfit by reason of conduct or condition that is seriously detrimental to the children and that integration of the children into father's home is improbable within a reasonable time due to conduct or conditions not likely to change. ORS 419B.504; *State ex rel Juv. Dept. v. Johnson,* 165 Or App 147, 156, 997 P2d 231 (2000). Because the majority concludes that the state failed to prove, clearly and convincingly, that father was unfit at the time of trial, it fails to reach the issue of "whether integration of the [children] into the home of [father] is improbable within a reasonable time due to conduct or conditions not likely to change." ORS 419B.504. As I will explain, I believe that the state did prove that father was presently unfit and, therefore, I would reach the question of whether integration of the children into father's home is improbable within a *reasonable* time. The answer to that question involves consideration of, among other things, how the children have been affected by father's situation.

It is undisputed that, at the time of trial, father was incarcerated and was, therefore, unable to care for his children. It is true that "we have consistently held that incarceration alone does not warrant a finding of unfitness, although a prolonged period of incarceration will warrant such a finding." 167 Or App at 457. However, while incarceration *alone* usually will not support a finding of unfitness, incarceration in addition to other factors may support such a finding. In my view, the majority incorrectly concludes that "*neither* father's incarceration nor the possibility of a relapse provides clear and convincing evidence that father [was] presently unfit under ORS 419B.504 (1997)." 167 Or App at 459 (emphasis added). The majority errs in analyzing father's incarceration and drug problems separately to determine whether he was unfit. At the time of trial, not only was father unable to physically care for his children because he was incarcerated, but,

as he testified, there would be an additional period of time after his release before he could possibly care for them. To be in a position to care for his children, father will have to prove that he is able to maintain his sobriety outside of a controlled environment, obtain steady employment, establish a home, and prove to SOSCF that he is a competent parent. Consequently, in my view, there is no question that, at the time of trial, father was unfit to parent by reason of conduct or condition.

As noted above, the question that the majority does not address and that I believe is determinative here, is whether "integration of the [children] into the home of [father] is improbable within a *reasonable* time due to conduct or conditions not likely to change." ORS 419B.504 (emphasis added). I agree with the trial court that the answer to that question is no.

In answering that question, I would first note that, as we pointed out in our decision in *State ex rel SOSCF v. Duncan,* 164 Or App 610, 613, 993 P2d 818 (1999), the statutory standard has changed. Now, rather than determining whether reintegration of the children into the parent's home is improbable in the "foreseeable future," we must decide whether reintegration is improbable "within a reasonable time." A "reasonable time" is defined in the statutes as "a period of time that is reasonable given a child's emotional and developmental needs and ability to form and maintain lasting attachments." ORS 419B.504; ORS 419A.004(17); *Duncan,* 164 Or App at 613-14. Consequently, in deciding what is a "reasonable time," we must consider all of the circumstances of each individual case, including the history of the parent's condition, its impact on the children, and the individual needs and abilities of each child.

In arguing that his parental rights should not be terminated, father relies strongly on his efforts to overcome his problems while in federal prison serving his sentence on the drug charges that resulted in the placement of his children in state custody in 1996. He contends that his efforts demonstrate that he is "entitled to have the opportunity to regain custody of his children." Father's efforts during this current incarceration are laudable. However, those efforts must be

considered in the context of father's past behavior and the impact that behavior has had on his children.

The record shows that father has had a fairly extensive history of treatment, relapse and escalating drug use. He was first convicted on drug charges in 1986. While serving a suspended sentence for that offense, he violated the conditions of his probation and was sent to prison. After serving three months in prison, he was given temporary leave. However, in 1989, he was again found in possession of drugs. He then entered and successfully competed a six-month chemical dependancy treatment program. He remained drug free for a period of about 18 months, after which he began using alcohol and drugs again. This relapse occurred in 1991, shortly after the birth of his first child. As father's drug use escalated, he lost his job. His involvement in the drug culture increased until, in 1996, after being unemployed for some time, he became involved in the manufacture of methamphetamine.

In May 1996, Eugene police officers raided the home, where father, mother, and the children lived, and found a methamphetamine lab. Following that incident, father did not begin a drug treatment program until approximately six months after his arrest. His delay in seeking treatment was apparently out of concern that his involvement in treatment might be used against him in his criminal case. In fact, he continued to use methamphetamine during the time between his May arrest and September when he was officially charged. He began a drug treatment program in November of 1996, at about the time that a hearing was scheduled on the wardship of the children. However, father again tested positive for drug use in April 1997. He began serving his prison sentence in October 1997.

Father's lengthy history of drug use is countered by his success in completing drug treatment programs while in prison. That success, however, is not a guarantee that father will be able to maintain his sobriety after his release. Dr. Basham, who, at the request of SOSCF, conducted a psychological evaluation of father in February 1997, testified at trial. He discussed his expectations for a person of father's personality type following release from prison:

"The fact of staying free of drugs while incarcerated really says nothing about long-term prospects. Many individuals who are drug-addicted and spend time in jail and prison will resume patterns of past drug use even after relatively long periods of incarceration. So a dependence on drugs is often a largely psychological factor which is not diminished solely by the fact of not having drugs available.

"It would certainly be a required number of months of returned living in the community and that would depend upon the level of motivation and monitoring. If a person was being, for example, monitored through urinalyses and faced with an immediate consequence of returning to prison for drug use, the external motivation for change remains and so there's still the question about whether they will make those efforts once those external motivations are gone."

In addition, witnesses at the termination proceeding, including mother, stated that father has a tendency not to perform as promised and to say or do whatever is necessary to get what he wants. The children's foster mother, who knew father quite well, testified that:

"I think [father] has good intentions, I think [he] wanted these things to happen. I think [father] is a very likeable, very nice person. He knows what people want to hear, he knows the right thing to do, he knows the right thing to say. And at the time, I think he believes it, that he can do it. He believes or knows, most of the time he believes it. But he just doesn't seem to be able to make it happen.

"* * * * *

"[Father] really presents a good image, [he] is a nice person, a good person in many ways. And I like [him] a lot. But I feel like his character is such that when somebody is watching and doing things he will look good. He got off early probation on his first time in prison because he was playing golf with the probation officer. He'd tell me about that. And how good he was doing and what he was doing and how they were really happy with his progress. But it wasn't that much longer that I felt he was re-involved with drug activities."

As discussed above, the statute requires that the children's developmental and emotional needs be considered

in deciding whether their reintegration into father's home is probable within a "reasonable time." The evidence here shows that the children have been adversely impacted by the uncertainty in their lives created by the unavailability of their parents. The majority notes that the children's therapist, Linda Seymour, testified that they are " 'doing very well by comparison [to other children who have been in foster care for the same length of time].' " 167 Or App at 454. This statement, however, must be considered in context. The same counselor also testified that she sometimes refers to children in situations similar to the one here "as the ghost children because they seem insubstantial in their connection with the world and with reality and with present time because they're so insecure about what's going to happen for them." The counselor testified with respect to the specific problems that father's children are experiencing:

"The problems were mostly around an anxiety adjustment to life's circumstances. Simply put, they had lots of stuff going on in their lives. It was confusing to them and they were anxious about it.

"* * * * *

"I think that they've come—it comes and goes with them when things change in their life. For instance, the last time they came back in, it was because of this pending termination, parental rights termination. There was a lot more anxiety. It was coming up for [daughter], for instance, it was coming up in a problem at school where her teacher had the complaint that she could no longer pay attention in school to do her schoolwork. And she exhibited a lot of what we call parentified behaviors, when the child takes on an adult role and tries to control the situation to reduce their anxiety by, you know, trying to make sure that everything stays in place and everybody does what they're supposed to, and bossing her little brother and behaviors like that. Lots of tension and stress.

"The other thing that I was concerned about with [daughter] at that time was that she had a remarkably different physical appearance from the previous time I had seen her. And apparently she had gone from a size eight dress to a size 12 dress in a few months. That would indicate to me that there was a great deal of anxiety in her life

and that she was probably over-eating to try to reduce that."

Fortunately, the children's foster mother has apparently provided a stable and supportive environment for the children. Nonetheless, the evidence shows that these children have been seriously affected by their circumstances. Because of the tension and stress surrounding their situation, the children have had trouble in school, social difficulties, physical problems, and the older child exhibits parentified behaviors—taking on adult roles to try to control her environment.

Seymour testified that the children need permanency, safety and to know where they are going to be next week, next month and next year. She said that if they have to wait another year for that permanency that:

"Their life goes on hold, it continues to be on hold developmentally. It's very difficult for a child to continue to make progress in their life, go through the developmental stages that they need to go through to become adults if even their present is tentative, that they don't know what's going to be predictable for them."

She also testified that, because their foster mother, whom the children have been with since their parents were arrested in 1996, would not be able to continue to care for them much longer, the best thing would be for them to go directly to a permanent placement.[1]

The majority holds that father should be given a reasonable opportunity to show that the changes he has made are permanent. I agree that parents should be given a reasonable opportunity to prove themselves as parents, but they are not entitled to unlimited opportunity. There comes a time when a child's need for permanency and stability requires that a parent's rights be terminated. At the time of trial, father had been unavailable to parent these children for three years. Contrary to the majority's understanding of the testimony at trial, the *earliest* father will be available to care

---

[1] Stewart understood this to mean a permanent placement with the children's maternal grandfather with whom they had been spending time and who expected to be the adoptive permanent placement.

for his children is a year. Rather than "cutting" against the state's case the uncertainty about how long it may take father to be ready to parent his children *is* the state's case. Under a best case scenario, father would be released from prison in October 1999. He would then be placed in a halfway house, followed by supervised release. He estimated that he *could* be ready for the children to be reintegrated into his home about a year after his release from prison. Even assuming that father is successful, these children should not be forced to remain "on hold" waiting for him.

The difficult and critical question in this case is whether, after considering all of the circumstances—including father's history, the length of time the children have been in foster care, and these children's need for permanency—the risk posed to the children, by the continuing uncertainty in their lives, if father's rights are not terminated, is too great. The trial court, which had the opportunity to observe father as a witness, addressed this question in an articulate and thoughtful manner and concluded that the risk to the children was too great:

> "The other thing that I think needs to be taken into account is the history that's presented by [father] and how I have to weigh that against the needs of the children. * * * And the point that I end up with that I've been unable to find a reasonable way to move away from or to avoid is that these children, as commented already by the testimony and argument of counsel and Ms. Seymour's testimony and by anybody's understanding, what needs the children have is for permanency now. And that's an extremely important need. That because of the convictions that [father] has, which I take to be not simply the most recent but it's also that his sentence was influenced by his prior conduct, he's unavailable to provide.

> "And while it may be all well and good for counsel to say, well, maybe a few more months is not that much to wait, that takes us—first of all, I think that's easy enough for counsel representing the father to say, but I don't have to buy into it. It also does not really address the additional question of whether or not these children should be put into the posture of the risk, which I consider to be high, that this won't work out. And I take into consideration with respect to that the fact that while [father] has presented himself as

hard working and now internally motivated to be clean and sober, my guess is that he would have said to me at the end of that session with Passages * * * that he is internally motivated to be clean and sober then, that his incarceration in the criminal division, when though relatively short, was enough to cure him and that he was now mature enough that he wasn't going to have a further relapse.

"But instead of the success that he would have wanted me to hear about, and he perhaps internally believed was true, by 1996 he's up to the hubs in the drug culture far worse than, as far as I know, than he was before. No longer was he simply possessing it or making delivery here or there, he was on full scale manufacturing routine * * *[.]

"And then, after the apparently successful treatment with ACES as provided by Mr. Ricker, we have yet another relapse in the time when he is under supervision and is facing sentencing in the federal case.

"So, I'd have to say that in my estimation, and I find by clear and convincing evidence, that the fact of his incarceration which will not make him available within a reasonable period of time, * * * I find by clear and convincing evidence that there is way too much risk that we're going to be looking down the same problem somewhere in the future. And it's way more risk than I'm going to put these children through."

I agree with the trial court that the state has proven that reintegration of the children into father's home in a "reasonable time is improbable" and that, under all of the circumstances here, termination is in the best interests of the children. I would affirm the trial court's decision to terminate father's parental rights.

Accordingly, I respectfully dissent.