Argued and submitted June 15, affirmed October 4, 2000, petition for review denied January 30, 2001 (331 Or 583)

In the Matter of
Rene Deloris Hammons, Jr., a Minor Child.

## STATE ex rel STATE OFFICE FOR SERVICES TO CHILDREN AND FAMILIES, *Respondent,*

*v.*

## David Doyle HAMMONS, *Appellant.*

(97-70045; CA A108365)

12 P3d 983

George W. Kelly argued the cause and filed the brief for appellant.

Judy Carol Lucas, Assistant Attorney General, argued the cause for respondent. With her on the brief were Hardy Myers, Attorney General, and Michael D. Reynolds, Solicitor General.

Before Kistler, Presiding Judge, and Deits, Chief Judge, and Brewer, Judge.

BREWER, J.

**BREWER, J.**

Father appeals from a judgment terminating his parental rights to his three-year-old daughter. The trial court terminated father's parental rights based on findings of unfitness, ORS 419B.504, neglect, ORS 419B.506, and abandonment, ORS 419B.508. On *de novo* review, ORS 419A.200(5), we conclude that clear and convincing evidence supports the trial court's determination that father is unfit to parent daughter under ORS 419B.504 and that termination of his parental rights is in the child's best interests. *See State ex rel Juv. Dept. v. Proctor*, 167 Or App 18, 20, 2 P3d 405, *on recons* 169 Or App 606, 10 P3d 332 (2000). Consequently, we affirm.

Father is 33 years old. He was placed in foster care at age five. In his early teenage years, father began "heavy" use of drugs and alcohol, which continued unabated until 1995. Father dropped out of high school by the eleventh grade. When he was 17 years old he fathered a child whom he has not seen since the child was three. At age 18, father moved from Oregon to California to live with his mother.

Father returned to Oregon in September 1995. He soon met and began dating daughter's mother. At that time, mother was pregnant with another child. Shortly after that child was born in May 1996, the State Office of Services to Children and Families (SCF) removed the child from mother's custody based on concerns that mother was suffering from "serious mental problems."[1] Father and mother were married in June 1996. Shortly thereafter, mother became pregnant with daughter. In the fall of 1996, father lost his job and moved to Arizona without mother in order to find work.

After father obtained work, he asked mother to join him in Arizona. Mother was reluctant to leave Oregon and, over the course of several months, father made repeated unsuccessful attempts to convince her to move to Arizona. In

---

[1] Mother's parental rights to the child were eventually terminated. Mother's appeal is proceeding separately. *See State ex rel SOSCF v. Hammons*, 169 Or App 589, 10 P3d 310 (2000).

December 1996, father spoke with Cynthia Fellez, the SCF caseworker who was handling mother's case, to discuss his problems with mother. Fellez told father that she was concerned about mother's mental stability and that father needed to play an important role in his unborn child's life. In late December, mother lost her living accommodations because of her role in an altercation; as a result, she became homeless. Father lost contact with mother and telephoned Fellez in January 1997 in an attempt to determine mother's whereabouts. In that conversation, Fellez again encouraged father to return to Eugene so that he could take care of daughter when she was born. In spite of Fellez's concerns, father did not return to Oregon at that time.

Daughter was born in April 1997. In late April, SCF removed daughter from mother's custody because of the pending termination proceeding involving mother's other child. Father did not learn of daughter's birth until he spoke with an SCF caseworker on May 5. Father then left Arizona, but instead of returning to Oregon, went to California to visit his mother. Father returned to Oregon in June, after he was subpoenaed in order to deal with his newborn daughter. Father first visited daughter at SCF's offices on June 18 and, at that time, SCF and father set up a regular visitation schedule consisting of three visits per week. With help from SCF employees, he fed daughter and changed her diapers during those visits.

SCF referred father to Dr. James Ewell for a comprehensive psychological evaluation, which occurred on July 17. Ewell reported father as having "a chaotic and unstable lifestyle" and an "impulsive, simplistic and demanding manner." Ewell diagnosed father with methamphetamine, cocaine, hallucinogen, alcohol and prescription medication dependencies, although father told Ewell that he was no longer using alcohol or any controlled substance. Ewell also concluded that father had "borderline intellectual" function and "antisocial personality disorder with narcissistic features." Ewell opined that father's intellectual limitations would make it difficult for him to "comprehend[ ] his child's emotional needs" and when "combined with other forms of psychological disturbance, the cumulative effect can be debilitating."

Ewell summarized his conclusions as follows:

"I do not believe [father] would be capable of parenting his daughter at a minimally adequate level. In addition to alcohol/drug treatment and parent training, he will require individual psychotherapy and anger management counseling. He also needs career guidance, homemaker skill training and other forms of supportive intervention to help him stabilize. His ability to form and maintain relationships is impaired. At the time of this assessment, his intentions regarding [mother] were somewhat difficult to assess. He had left decisions regarding their future 'to God.' He had exclusively negative things to say about her, and in fact seemed to consider her a severe physical threat to his own safety. He would not, however, commit to terminating their relationship. Given his psychological condition, I believe there is a chance he may well reunite with her. In fact, their volatile interactions may continue for some time. Again, [father] is a severely maladjusted person who will require extensive treatment. If he does partner with [mother], this will only exacerbate his problems. The prognosis for change in this case is considered quite poor."

On August 7, the juvenile court entered an order establishing dependency jurisdiction over daughter. Later that month, SCF referred father to Benton County Mental Health for a drug and alcohol evaluation. An outpatient counselor concluded, based entirely on father's self-report, that father did not need drug and alcohol treatment. However, the counselor recommended mental health counseling and, soon after, father began anger management therapy with Dale Cox, a mental health specialist at Benton County Mental Health. SCF also referred father to a 10-week parenting class at Linn Benton Community College, which he began in late August. On September 24, father executed a service agreement with SCF, which had as its goal family unification. Father agreed, among other things, to continue anger management counseling, to participate in a "Nurturing Program," which included the parenting class and alcohol and drug treatment if needed. Father also agreed to obtain regular employment.

As required by the agreement, father completed the parenting class. He also attended four of eight scheduled anger management therapy sessions between August 1997

and January 1998. In addition, father began vocational rehabilitation training. Father's prior work experience was limited to motel and fast-food restaurant jobs. The vocational rehabilitation counselor determined that father was not currently employable because of limited cognitive ability, carpal tunnel syndrome and knee problems and, thus, arranged "sheltered"[2] employment for father.

Father's visits with daughter during the summer of 1997 through mid-January 1998 were supervised by SCF employee Katherine Watson. Watson testified that father was implementing the knowledge he had gained in parenting classes during his visits.

On February 4, father and SCF executed a second service agreement, in which father agreed to continue parent training and vocational rehabilitation programs. Father also agreed to maintain regularly scheduled visits with daughter. At that time, SCF considered father to be the primary placement resource for daughter, but the agreement provided that if father did not comply with its terms, SCF would consider pursuing the termination of his parental rights.

Father completed two more parenting classes between February and June 1998 and also continued his vocational rehabilitation program. During that period, father's schedule increased to four visits per week with daughter. Beginning in April, SCF also permitted father to have some home visits with daughter. By early May, SCF believed that the main obstacles to daughter's placement with father were his lack of stable employment and his transitional living situation. Since his return to Oregon, father had sometimes lived in motels, had lived with mother periodically and, since the fall of 1997, had been living at Tri-Center Home (Home), a transition home for adults. Although the Home allowed daughter to visit, its rules did not allow children to live there. On May 8, SCF tendered a third service agreement to father, in which SCF requested father to change his living situation. Father never signed that agreement.

----

[2] Sheltered work is state subsidized employment that primarily serves people with disabilities.

Father missed a total of 11 scheduled visits with daughter from February through May. Nevertheless, during May and early June, SCF caseworkers believed that father was developing a relationship with daughter and that father was starting to parent her. He began to acquire items such as a stroller, a high chair, and toys. In mid-June, however, the caseworkers noticed changes in father's behavior. Father cancelled eight visits with daughter in June. He also missed service appointments without explanation, and SCF received reports that father had demonstrated an explosive temper at the Home. By August, father was behind in rent payments and, in addition, his behavior problems had escalated to such an extent that the Home evicted him. Sometime in early August, father disappeared, leaving behind most of his personal effects. Father also failed to start a sheltered work position that had been arranged for him at Goodwill Industries. According to his vocational rehabilitation counselor, father simply "dropped out of sight" without explanation.

Unknown to SCF at the time, father began using alcohol and marijuana in June. He had met a woman who was using drugs and alcohol and had relapsed within four days of meeting her. In early August, father and the woman left Oregon for Florida. Father did not notify SCF of his departure. While he was in Florida, father indulged in heavy abuse of both alcohol and crack cocaine. Father testified that he went to Florida for "rehabilitation," but could not remember the dates of treatment because his "memory was impaired" as a result of alcohol and substance abuse. SCF eventually learned that father was in Florida but, despite an active search, was unable to find him.

Father returned to Oregon in December but did not contact SCF at that time. After he returned to Oregon, father continued using alcohol and also began using methamphetamine because crack cocaine was not available to him. On December 23, father went to mother's house, and the two drank alcohol together during the Christmas holiday. Their reunion ended with a domestic dispute that resulted in police intervention. Also on December 23, almost five months after its last contact with him, SCF filed a petition seeking termination of father's parental rights.

By January 11, 1999, father had learned about the termination petition. On that date, father wrote a letter to the Oregon Attorney General's office complaining about its involvement in the termination proceeding. Shortly thereafter, father enrolled in an outpatient drug rehabilitation program and began to attend Narcotics Anonymous meetings. However, father did not contact SCF until January 29. In a telephone conversation that day with the permanent planning worker assigned to his case, father admitted that he had "messed up" and inquired about the termination proceedings. The caseworker told father that SCF was committed to proceeding with termination of his parental rights. Father did not request to visit daughter at that time. In February, father had a friend write a letter to his state senator informing her of his situation and requesting help. That letter stated, in part:

"I am a recovering Drug & [alcohol] addict. *I've been clean and sober for three and a half years. Slipped one time.* [SCF] is about to terminate my parental rights. According to them I abandoned my child, because I went to Florida for rehab. There is a long waiting list here in Oregon. The only thought I had was the sooner I went in treatment the faster I got what was needed [and] the faster I would get my daughter back. That doesn't seem to be the case. *I've done everything that was asked of me, but nothing I did would satisfy the court or case worker.* * * * Can you please tell me where I went wrong?" (Emphasis added.)

In mid-March, father informed SCF that he wished to resume visits with daughter. Father also requested information from SCF about parenting classes. SCF referred father to a program at Linn Benton Community College, and father began taking classes again. Father attended approximately half of the scheduled classes. Despite initial resistance from the caseworker, SCF also allowed father one visit with daughter every two weeks, beginning on April 30. Father had five supervised visits with daughter in 1999 and cancelled another. During those visits, the supervisor observed that daughter was slow to warm up to him, and was uncomfortable sitting on father's lap or being held by him.

On May 12, SCF referred father for a psychological evaluation by Dr. Robert Basham. In his written report, Basham stated:

"[I]t does not appear that [father] is functioning [at] the bor-derline range of intelligence at this time, but does neverthe-less have some weaknesses in his intellectual abilities that increase the risk of using poor judgment in his parental decision making. Results on the current test suggests that [father] has the basic intellectual ability to benefit from job training programs and to complete his GED or pursue fur-ther school should he desire to do so."

Basham diagnosed father with polysubstance dependence, antisocial personality disorder, and post-traumatic stress disorder.

In the summary and conclusions section of his writ-ten report, Basham stated:

"Current test results suggest some improvement in [father's] verbal abilities and suggest his level of intellec-tual functioning is somewhat higher than that seen two years ago, when he was diagnosed with borderline intellec-tual functioning [by Dr. Ewell]. Current intellectual abili-ties pose a mild risk for parental functioning, but this would not, by itself, be a barrier to raising his daughter. Results on the current personality questionnaires both show clear signs of antisocial personality traits * * *. These results, as well as [father's] own descriptions of his functioning, sug-gest that he [is] currently at a similar level of functioning as he was two years ago, having overcome the major decline seen in the latter half of 1998. His earlier life history is con-sistent with the presence of antisocial personality disorder, even though this has not been reflected in much criminal behavior (as far as I am aware).

"* * * * *

"[Father's] history over the past two years that he has been involved with SCF shows him able to make significant pro-gress and to overcome some of the risk factors that were present two years ago. However, it also shows that [father has] continuing problems with life stability and [is] prone to make impulsive and very poor decisions that undermine the gains that he had shown through the summer of 1998. [Father] continues to have the potential for further such relapses or decline in functioning, and the fact of having made progress and gains does not remove the risk of such. Events over the past year largely confirm the previous find-ing that he has a personality disorder, but it currently

appears to be simply antisocial personality disorder (rather than mixed antisocial and narcissistic).

*"Although [father] currently appears to be back 'on track' with regards to dealing with his life's problems this will not eliminate the risks posed by his personality disorder. A personality disorder is an enduring and relatively untreatable condition, and it is not likely that [father] will overcome this problem within the near or foreseeable future. At times when [father] is doing well he probably would be able to provide acceptable care to his daughter, but he is not currently psychologically capable of maintaining this level of functioning on an ongoing basis, and his daughter would be at risk for neglect or abuse (not necessarily at the hands of [father]) were she placed in his care. Thus, [father's] prognosis remains poor at this time and he can not be considered psychologically capable of providing his 2 year old daughter the level of care she requires on an ongoing basis."* (Emphasis added.)

The trial began in mid-July. Father testified that he had last used drugs and alcohol in January. Between January and July, father had completed two outpatient classes and had attended therapy sessions with three alcohol and drug counselors. Two of the counselors reported that, early in the program, father's attendance was "sporadic" and "poor." However, eventually father's attendance improved. At the time of trial, father was still in the early stages of recovery and, according to one of the counselors, would not reach the "middle stage" until he had abstained from alcohol and drug use for approximately a year and a half.

In support of termination, SCF relied on alternative grounds of unfitness, ORS 419B.504, neglect, ORS 419B.506, and abandonment, ORS 419B.508. The trial court found that SCF had proved each of the alleged grounds by clear and convincing evidence and further determined that it was in daughter's best interests that father's parental rights be terminated and that she be freed for adoption. Consequently, the court entered judgment terminating father's parental rights. This appeal followed.[3]

---

[3] The trial court terminated mother's parental rights in the same proceeding. However, her case is not consolidated with father's on appeal. We do not discuss it further.

On appeal, father challenges each of the trial court's findings and conclusions. Because we conclude that the trial court properly terminated father's parental rights pursuant to ORS 419B.504, we limit our discussion to that ground.

■     ORS 419B.504 provides, in part:

> "The rights of the parent or parents may be terminated as provided in ORS 419B.500 if the court finds that the parent or parents are unfit by reason of conduct or condition seriously detrimental to the child and integration of the child into the home of the parent or parents is improbable within a reasonable time due to conduct or conditions not likely to change."

The statute poses two related but separate questions. *State ex rel SOSCF v. Stillman*, 167 Or App 446, 456, 1 P3d 500 (2000). The court must first determine by clear and convincing evidence whether the parent is "presently unfit by reason of conduct or condition that is seriously detrimental to the child," and, if so, whether "that conduct or condition makes it improbable that the child can be integrated into the parent's home within a reasonable time." *Id.* In order to support termination, the record must disclose that it is highly probable that the parent "is not presently able, and will not be able within a reasonable time, * * * to meet [the child's] physical and emotional needs." *Proctor*, 167 Or App at 29; *see State ex rel Juv. Dept. v. Johnson*, 165 Or App 147, 156, 997 P2d 231 (2000). If both questions are answered affirmatively, it remains to be decided whether termination is in the child's best interests. ORS 419B.500; *Stillman*, 167 Or App at 456.

In assessing the conduct or conditions that bear upon father's fitness to parent daughter, the court must consider, but is not confined to, the following factors:

> "(1)  Emotional illness, mental illness or mental deficiency of the parent of such nature and duration as to render the parent incapable of providing proper care for the child for extended periods of time.
>
> "(2)  Conduct toward any child of an abusive, cruel or sexual nature.

"(3)   Addictive or habitual use of intoxicating liquors or controlled substances to the extent that parental ability has been substantially impaired.

"(4)   Physical neglect of the child.

"(5)   Lack of effort of the parent to adjust the circumstances of the parent, conduct, or conditions to make the return of the child possible or failure of the parent to effect a lasting adjustment after reasonable efforts by available social agencies for such extended duration of time that it appears reasonable that no lasting adjustment can be effected.

"(6)   Criminal conduct that impairs the parent's ability to provide adequate care for the child." ORS 419B.504(1) to (6).

The trial court found by clear and convincing evidence that the state had proven that father was unfit in seven separate respects.[4] We agree with the court's ultimate finding that father is unfit but, in explaining our reasons, emphasize those allegations that, in our view, bear the greatest weight.

■ ■   We first focus on the allegation that father suffers from an emotional or mental illness or deficiency that is of such a nature and duration that it renders him incapable of providing care for daughter for extended periods of time. In order to establish unfitness on that ground, more is required

---

[4] The state alleged, and the trial court found, that father was unfit by reason of:

"(a)   Lack of effort or failure to obtain and maintain a suitable or stable living situation for the child so that return of the child to the father is possible.

"(b)   Failure to present a viable plan for the return of the child to the father's care and custody.

"* * * * *

"(d)   An emotional illness, mental illness, or mental deficiency of such nature and duration as to render the father incapable of providing care for extended periods of time.

"(e)   Emotional neglect of the child.

"(f)   Lack of effort to adjust the father's circumstances, conduct or conditions to make return of the child to the father possible.

"(g)   Failure to effect a lasting adjustment after reasonable efforts by available social agencies for such extended duration of time that it appears reasonable that no lasting adjustment can be effected.

"(h)   Abandonment of the child."

than a mere diagnosis of emotional or mental illness or deficiency. *See Johnson*, 165 Or App at 158-59. In 1997, Ewell diagnosed father with polysubstance dependencies, "borderline intellectual functioning," and "antisocial personality disorder with narcissistic features." Ewell determined that the cumulative effect of those problems was "debilitating." He concluded that father was not capable of parenting daughter at a "minimally adequate level," that father was a "severely maladjusted person who [required] extensive treatment," and that "the prognosis for change * * * was quite poor."

In May 1999, Basham diagnosed father with "antisocial personality disorder" but concluded that father's "intellectual functioning [was] somewhat higher than * * * when he was diagnosed with borderline intellectual functioning [by Ewell]." He opined that father's intellectual abilities posed only a "mild risk for parental functioning" which, alone, were not a "barrier" to parenting. Basham also diagnosed father as having post-traumatic stress disorder, which he attributed to childhood abuse.

Despite observing that father had made progress in addressing some of the risk factors that Ewell diagnosed, Basham nonetheless concluded that father had "continuing problems with life stability and [was] prone to make impulsive and very poor decisions that undermine[d] the gains he had shown [before he resumed abusing drugs and alcohol in June 1998]." He noted that father continued to have the "potential for further * * * relapses or decline in functioning, and the fact of having made progress and gains does not remove the risk of such." Basham ultimately concluded that father's prognosis was "poor" and that he could not be considered "psychologically capable of providing * * * daughter the level of care she requires on an ongoing basis."

Although Basham's conclusions are not identical to those reached by Ewell two years earlier, one unifying assessment pervades both evaluations: Father has emotional disorders and mental deficiencies that combine to render him incapable of providing care for daughter for extended periods of time. Father's abrupt departure from Oregon in 1998 and his attendant absence from daughter's life for six months—after having previously received and apparently benefitted

from extensive services—is a telling testament to the complicated array of emotional and mental problems that detract from his reliability as a stable parent. Furthermore, father's minimization of his conduct and lack of candor in relating the problems that led to the filing of the termination petition, as shown in the letter he sent to a legislator in February 1999, demonstrate poor insight into his own condition and circumstances. In sum, the evidence showed that father was unfit by reason of one or more emotional disorders and intellectual deficiencies of such nature and duration as to render him incapable of caring for daughter for extended periods of time. ORS 419B.504(1).

■■       We turn to the state's allegation that father is unfit by reason of failure to effect a lasting adjustment after reasonable efforts by available social agencies for such extended duration of time that it appears reasonable that no lasting adjustment can be effected. In determining whether SCF has made reasonable efforts to assist father in making a lasting adjustment, we examine the particular circumstances of each case. *State ex rel SOSCF v. Burke*, 164 Or App 178, 189, 990 P2d 922 (1999), *rev den* 330 Or 138 (2000).

Here, the record establishes that SCF made reasonable efforts to help father to develop his parenting skills but that father nonetheless failed to make a lasting adjustment of his conduct and condition. After daughter's birth in 1997, SCF referred father to alcohol and drug treatment, parent training, anger management, and career guidance services. Based solely on his self-report of sobriety, father did not receive drug and alcohol treatment at that time. SCF steadily worked for more than a year to prepare father to become the primary placement resource for daughter. During that time, father was learning parenting skills and was beginning to implement them in his contacts with daughter. In fact, the two began to establish a relationship; *however*, father failed to make a lasting adjustment.

■       In June 1998, father resumed his virtually lifelong abuse of alcohol and drugs, his anger problems resurfaced and, in August, he left for Florida for almost five months where he continued heavy use of drugs and alcohol. Father did not immediately contact SCF on his return to Oregon.

Instead, he continued using alcohol and drugs for approximately another month. He made no effort to resume visits with daughter until March 1999, only four months before trial.

Father concedes that his use of alcohol and drugs substantially impaired his ability to parent daughter during the last half of 1998. However, he disputes that "those conditions still exist." Father argues that he has "addressed [his] addiction in every way anyone could want" by participating in the outpatient rehabilitation program at Linn County Alcohol and Drug. Father asserts that he should be given the opportunity to show that rehabilitation has controlled his alcohol and drug addictions and eliminated the barriers to his parenting of daughter. In other words, father contends that, irrespective of his past circumstances, at the time of trial he was not unfit to parent daughter. We disagree.

In May 1999—just two months before trial—Basham reported that "[father] continue[d] to have the potential for * * * relapses * * * and the fact of having made progress and gains does not remove the risk of such." At trial, Basham testified that father's alcohol and drug dependency problems combined with his antisocial personality disorder and post-traumatic stress disorder to "substantially impair" father's ability to parent. According to Basham, the combination of those factors made father more prone to relapse and increased the risk that father could inflict emotional or psychological harm on daughter. *Cf. Stillman*, 167 Or App at 457 (father's risk of relapse did not justify termination of parental rights because he had maintained ongoing recovery *over several years* and his progress was substantial). In addition, at the time of trial, father was living in assisted housing for recovering addicts, which did not allow daughter to live with him. He also remained unemployed and lacked the financial means to support daughter. In those respects, father had made no improvement despite intensive agency intervention over a two-year period.

In combination, the foregoing factors demonstrate that, at the time of trial, father had failed to effect a lasting adjustment after reasonable efforts by available social agencies for an extended duration of time. *Compare Johnson*, 165

Or App at 157 (fact that parents had made their home a safe and suitable environment by the time of trial weighed in favor of not terminating their rights) *with Stillman*, 167 Or App at 457 (fact that father was in prison and could not currently provide a home for children did not automatically warrant a finding of unfitness). The question remains whether "it appears reasonable that no lasting adjustment can be effected" that would permit the integration of daughter into father's home within a reasonable time.

■ ■    Although we recognize that father is entitled to a reasonable opportunity to show that any changes to which he aspires are permanent, in determining whether integration can occur within a "reasonable time," we focus on the child's "emotional and developmental needs and ability to form and maintain lasting attachments." ORS 419A.004(17) (1997); *see Stillman*, 167 Or App at 456, 459. Daughter has lived separately from her parents in foster care virtually since birth. At the time of trial, she was almost two and one-half years old. Basham testified that when the emotional bonds attaching a young child to an adult have been disrupted—as happened when father disappeared in 1998—it is "psychologically detrimental to the child. [It is] a significant stressful event, and disrupted attachments can lead to serious psychological problems and adjustments for the child later." That testimony is reinforced by daughter's reaction when visits were resumed shortly before trial. According to Basham, father expressed no empathy for daughter's reaction to his sudden disappearance, nor did he appreciate the effect of his months-long absence from her life. Basham concluded that father's lack of insight was consistent with his antisocial personality disorder.

Basham testified that father's chemical dependence and post-traumatic stress disorder were relatively treatable, meaning that father could make significant progress toward overcoming them within a year if he were fully committed to treatment. However, Basham stated that father's personality disorder was relatively untreatable, that it would tend to persist for years, and that it could not likely be mitigated even within two years. According to Basham, father's personality disorder posed a significant risk of harm to daughter's emotional well being, because it contributed to his unstable and

irresponsible functioning as a parent. In light of that testimony, and the ample evidence that supports it, it is highly improbable that daughter could be integrated into father's home within a reasonable period of time.

Thus, we answer both questions posed by ORS 419B.504 affirmatively. At the time of trial, father was presently unfit by reason of conduct and condition seriously detrimental to daughter. In so finding, we rely primarily on the factors identified in ORS 419B.504(1) and (5). Furthermore, because they are problems of longstanding duration and the prospects for their remediation are doubtful, "that conduct and condition makes it improbable that [daughter] can be integrated into [father's] home within a reasonable time." *Proctor*, 167 Or App at 29. We thus turn to the ultimate question: whether termination of father's parental rights is in daughter's best interests. ORS 419B.500.

■ In concluding that termination of father's parental rights was in daughter's best interests, the trial court stated:

"Even knowing that surrendering to drug and alcohol abuse and leaving the state would lead to termination of his parental rights, father chose this course of conduct. He did not take any action that can be interpreted as an effort to communicate or reunite with his daughter until January 29, 1999. There can be no doubt that he wanted to have his daughter until August 1998, and that he wants her now. The evidence shows, however, that he cannot perform the full time duties of a parent at the present time and that it will be at least another year before he can hope to perform at a minimum level. Even after a year, according to expert testimony, it is unlikely that father will be able to do so. It is true that he does well during short periods of visitation, however, this evidence does not support a conclusion that he can adequately parent 24 hours each day, 7 days a week, year after year. In addition, father is no closer to finding [a] home for his daughter than he was in August, 1998, and his job prospects are no better.

"* * * The child has been in the same foster home all her life. She knows her father as a visitor; one who went away without notice or contact for a substantial portion of her life. The law gives children the right to a permanent home and a minimally adequate and consistent lifestyle. Father has not provided this life for his daughter * * * and it is

doubtful that he can, for a period of time that is too long for her to wait."

The trial court's reasoning is succinct and apt. We agree that termination of father's parental rights is in daughter's best interests.

Affirmed.