Argued and submitted September 14, affirmed November 24, 1999, petition for review denied March 21, 2000 (330 Or 138)

In the Matter of Maurilio L. Cruz,
Joseph N. Barnfather, Jacob W. Barnfather,
Bryanna A. Burke, Gina Reese Burke and
Glenn Riley Burke, II, Minor Children.

STATE ex rel STATE OFFICE FOR
SERVICES TO CHILDREN AND FAMILIES,
*Appellant,*

*v.*

Denise BURKE,
*Respondent.*

(5381J; CA A104682 (Control))

In the Matter of Maurilio L. Cruz,
Joseph N. Barnfather, Jacob W. Barnfather,
Bryanna A. Burke, Gina Reese Burke and
Glenn Riley Burke, II, Minor Children.

STATE ex rel STATE OFFICE FOR
SERVICES TO CHILDREN AND FAMILIES,
*Appellant,*

*v.*

Denise BURKE and Glen BURKE,
*Respondents.*

(58380J, 5382J, 6313J, 5664J, and 6117J;
CA A104683, A104684, A104686 and A104687)
(Cases Consolidated)

990 P2d 922

Michael C. Livingston, Assistant Attorney General, argued the cause for appellant. With him on the brief were Hardy Myers, Attorney General, and Michael D. Reynolds, Solicitor General.

Mary J. Grimes argued the cause and filed the brief for respondent Denise Burke.

R. Brooke Holstedt argued the cause and filed the brief for respondent Glen Burke.

Before De Muniz, Presiding Judge, and Haselton and Wollheim, Judges.

DE MUNIZ, P. J.

## DE MUNIZ, P. J.

The state appeals from judgments denying petitions to terminate the parental rights of mother and father. ORS 419B.500 (1997). We review the trial court's ruling *de novo*, ORS 419A.200(5), to determine whether the state has demonstrated, by clear and convincing evidence, ORS 419B.521, that the parental rights of mother and father should be terminated. We affirm and limit our discussion to the petition seeking termination of father's parental rights.

We begin with a recitation of the facts. In 1984, when father was 17, a Kansas state juvenile court found that he had sexually abused his 13-year-old stepsister. In 1989, at age 22, father pled guilty in Oregon to rape in the third degree and was sentenced to five years in prison. In late 1991 or early 1992, father was paroled by the Oregon Department of Corrections (DOC). His conditions of parole included participation in sex offender treatment and no contact with minor females.

Father did not enter treatment immediately. In April 1992, father was convicted of burglary in the first degree and returned to prison. By July 1994, father was back on parole and working for an automotive business and a fast food restaurant. Father met mother while both were working at the fast food restaurant.

Mother's circumstances were as follows. In early 1994, mother and her three youngest sons—ages four, two, and one—lived in Salem.[1] Each of the boys has a different father. In March 1994, the State Office for Services to Children and Families[2] (SOSCF), removed the boys from mother's home because Maurilio Gallard-Cruz, father of the middle boy, sexually abused one of the boys. Gallard-Cruz

---

[1] Mother had four sons when she met father. At that time, her oldest son was in the custody of his natural father.

[2] The State Office for Services to Children and Families (SOSCF) was previously known as Children's Services Division (CSD). The name was changed in 1993 when the dependency code was amended. Or Laws 1993, ch 33, § 108. Reference to "CSD" appears throughout the record; however, to avoid confusion, we use "SOSCF" to refer to the agency.

was imprisoned, and the boys were returned to mother's custody.

SOSCF became aware that father and mother were living together in Keizer on October 20, 1994. Mother's SOSCF caseworker contacted father's parole officer and learned that father had delayed getting a sex offender evaluation and that father was restricted from contact with minor females. SOSCF concluded that father's status as a sex offender posed a threat to mother's three boys. Father was evicted from the home and told to have no contact with mother's boys. Father violated the no contact restriction, and the boys were placed in SOSCF custody on November 8, 1994. In December 1994, SOSCF obtained a court order prohibiting contact between father and mother's three boys.

Father had completed a sex offender treatment evaluation in early October 1994. Until that time, father had maintained that he could not afford the evaluation. Father's parole officer learned, however, that father was making monthly payments of $400 for a car that he had purchased for $4,000. Additionally, in September 1994, father hired a private investigator to locate his three-year-old daughter from a previous relationship.[3]

During the evaluation in October 1994, father revealed that he had engaged in sexual contact with a 15-year-old female five months previously. As a result of this disclosure, father received a parole sanction of six months incarceration, which he began serving December 15, 1994. At that time, mother was pregnant. Mother and father were married in May 1995 while father was in prison. Their daughter, Bryanna, was born on June 28, 1995. Father, who had been released two weeks earlier, asked for and received permission to attend the birth. Bryanna was born with a congenital heart defect and was taken into state custody soon after her birth.

Father resumed working at the fast food restaurant after his release. His superior was told that father was not

---

[3] Father also has a son by another woman. That child lived with his mother, and father began visiting the boy, who was six, soon after being released from prison in 1994.

allowed to have unsupervised contact with minor females. In June 1995, father informed his parole officer that he was willing to enter sex offender treatment but expressed reservations about going into debt in order to pay for the treatment. The parole officer reported that he believed that father was sincere but doubted his ability to follow through. In July 1995, father attended a family unity meeting arranged by SOSCF, where he once again expressed his willingness to enter treatment. In August 1995, father began treatment with Schaub.

The treatment with Schaub did not go well. Initially, father was unhappy because Schaub restricted him from contact with all minors, male and female, pending a full disclosure polygraph exam. Father complained regularly to his parole officer about Schaub's program and requested permission to attend treatment elsewhere.[4] In October 1995, father self-reported casual contact with a minor female at his place of employment. Father skipped a polygraph test scheduled in November 1995. At the end of November, father was arrested and given 15 days incarceration for poor performance in treatment, contact with minors, and failure to complete the polygraph exam. While father was serving that time, he attended a treatment program.

By November 1995, father and mother had sold most of their belongings and were living in father's car. Mother's three sons and Bryanna were in foster care. Because father was indigent, his parole officer agreed to transfer father to a new treatment program. DOC subsidized father's treatment with Doyle beginning in January 1996. On Doyle's recommendation, father was required to quit his fast food restaurant job because of the potential for contact with minor females. Additionally, father was required to give up his newly rented apartment because of its proximity to a middle school. Father found a new apartment and began working the graveyard shift at a convenience store.

---

[1] Father complained that the group size was too small, consisting of only two people. He also objected to certain intervention techniques. At one point Schaub prevented father from recording a treatment session.

After a period of adjustment, father began to make progress. In May 1996, Doyle reported that father had completed phase one of his treatment, described as "the biggest hurdle for many people," by providing a written sexual history and passing the "sexual history disclosure polygraph with flying colors." Father disclosed that he had violated the parole condition against contact with minor females by having intimate contact with more than 15 different partners. Doyle stated that "it appears that this is indeed a sincere effort on [father's] part to deal with a life long problem of sexual deviancy, in order to make significant changes within himself[.]" Doyle went on to state that father's goal from the start of treatment was to be allowed supervised contact with his children. Based on Doyle's report, DOC extended father's treatment subsidy to June 1996.

In July 1996, after the DOC subsidy ended, father began to have serious financial problems. Father was fired from the convenience store for failing to complete a shift, his car was wrecked in an accident, and he was $345 behind in child support payments to the state. Father found employment at a garage but lost that job when he received 15 days' incarceration for violating the no contact order with mother's children. In September 1996, father was $800 behind in his rent and delinquent on payments for child support and treatment. Father and mother requested assistance from SOSCF in paying for father's treatment and other services.[5] SOSCF summarily denied parents' request. Father quit seeing Doyle in November 1996. Father absconded briefly from supervision, for which he served an 18-day sanction. In December 1996, father's post-prison supervision expired.

Father's second daughter, Gina, was born in November 1996. Gina remained in mother's custody as part of SOSCF's family reunification plan. Around June 1997, father took Gina to his mother's home in Kansas. There was no court order barring father's contact with the child at that time. Gina was returned to Oregon, and, in August 1997, she

---

[5] SOSCF provided mother with considerable assistance, including homemaking services, parent training, therapy for partners of sex offenders, assertiveness training, and intensive family services.

was placed in foster care. Father was ordered to have no contact with her. In September 1997, SOSCF discontinued all services to parents, except visitation, because father failed to complete sex offender treatment.

There is little in the record about father's activities during much of 1997. It appears that father was a self-employed contractor, operating his own construction company. It is clear that father was not in treatment at any time during 1997. Further, in spite of SOSCF's requirement to live separately, parents were reportedly living together off and on. At other times, father lived with friends or in his car. At trial, mother and father testified that they were not able to maintain separate households because the state was garnishing so much of their paychecks.

In April 1998, when the state decided to seek termination of father's parental rights, father entered treatment with Harrington. At that time, father was working at a family restaurant, and the state was garnishing about 65 percent of his wages for child support. Father's take home pay, after garnishment, averaged $400 to $500 a month. One of father's paychecks, for two weeks of work, was zero. Shortly after reentering treatment, father lost his job because the restaurant where he worked closed.

Harrington, who met with father four hours a month and charged him $50 an hour (nearly half of father's take home pay), knew that father was having difficulty paying for treatment but required father to complete and pay for a second disclosure polygraph. Father did not complete the polygraph test and fell behind in paying for treatment. Harrington testified that father's progress was unsatisfactory and that father's failure to pay for treatment indicated that he was not making treatment a priority. When father began falling behind on his payments to Harrington, he and mother once again approached SOSCF for financial help. However, the agency informed them that it would "absolutely not" provide assistance for father's sex offender treatment. Father stopped seeing Harrington in July 1998. At that time, father owed Harrington over $300.

Father was allowed to participate in supervised visitations with the children beginning in April 1998, after the

agency decided to seek termination. SOSCF maintained a log, detailing father's interaction with all six of the children, including the youngest, Glenn II, who was born in June 1998. On the whole, father interacted well with the children. SOSCF records portray father as generally engaged and well disposed to each of the children. Father displayed limited parenting skills, and SOSCF workers corrected him on minor issues, such as engaging in food fights with the older boys and letting the children drink from the same cup.

In August 1998, one month after father discontinued treatment with Harrington, the state petitioned to terminate father's parental rights. By the time of trial, in September 1998, father had found new employment as a manager for a used car lot. Mother, who works for a grocery store as a cashier, had completed assertiveness training, parenting classes, and had participated in counseling and psychotherapy.

The trial court denied termination because there was "no evidence of any improper conduct towards father's children or any other prepubescent child" and because the evidence presented did "not establish that [father] is a danger to his children, once he received appropriate treatment[.]" The court further concluded that father is willing to undergo the required treatment but is unable to pay the costs.

■ As a preliminary matter, the state's appeal regarding the youngest child, Glenn II, was dismissed by this court because Glenn II had not been found to be within the court's jurisdiction at any stage of the proceedings. Therefore, the state's appeal as to father's parental rights is limited to his two daughters, Bryanna and Gina. On appeal, the state argues that father is unfit because he previously engaged in sexual conduct with minors and failed to adjust his conduct or condition so that his children could be returned.

■■ To prevail, the state must prove, by clear and convincing evidence, that father is presently unfit by reason of conduct or condition that is seriously detrimental to the child and that integration of the child into the parent's home is improbable within a reasonable time due to conduct or conditions not likely to change.[6] *State ex rel Juv. Dept. v.*

---

[6] ORS 419B.504 provides:

*Pennington,* 104 Or App 194, 201, 799 P2d 694 (1990), *rev den* 311 Or 166 (1991) (applying *former* ORS 419.523(3) (1989), *renumbered as* ORS 419B.504 *amended by* Or Laws 1997, ch 873, § 7). We review the trial court's ruling *de novo,* ORS 419A.200(5), giving "considerable weight" to the court's findings on issues of credibility. *State ex rel Juv. Dept. v. Geist,* 310 Or 176, 194, 796 P2d 1193 (1990).

■      We begin by reviewing whether father's conduct or condition is seriously detrimental to his children. Evidence of an underlying problem is not, by itself, sufficient to declare a parent unfit. *See State ex rel Juv. Dept. v. Harden,* 51 Or App 681, 686, 626 P2d 944 (1981) (evidence of alcohol abuse alone is insufficient to terminate parental rights). The state must also show that the parent's conduct or condition is seriously detrimental to the children. *Id.* at 686. The state presents nothing here that suggests that father's conduct has had a direct effect on his daughters. In fact, the record is devoid of evidence that father's conduct has had any effect on his daughters whatsoever. Significantly, according to the record, the last time father had sexual contact with a minor was a year before Bryanna was born.[7] To be sure, father's status as

---

"The rights of the parent or parents may be terminated as provided in ORS 419B.500 if the court finds that the parent or parents are unfit by reason of conduct or condition seriously detrimental to the child and integration of the child into the home of the parent or parents is improbable within a reasonable time due to conduct or conditions not likely to change. In determining such conduct and conditions, the court shall consider but is not limited to the following:

"(1) Emotional illness, mental illness or mental deficiency of the parent of such nature and duration as to render the parent incapable of providing proper care for the child for extended periods of time.

"(2) Conduct toward any child of an abusive, cruel or sexual nature.

"(3) Addictive or habitual use of intoxicating liquors or controlled substances to the extent that parental ability has been substantially impaired.

"(4) Physical neglect of the child.

"(5) Lack of effort of the parent to adjust the circumstances of the parent, conduct, or conditions to make the return of the child possible or failure of the parent to effect a lasting adjustment after reasonable efforts by available social agencies for such extended duration of time that it appears reasonable that no lasting adjustment can be effected.

"(6) Criminal conduct that impairs the parent's ability to provide adequate care for the child."

[7] The state emphasizes that four of father's alleged victims were under 12 years of age. However, the record shows that father himself was preadolescent at the time. According to expert testimony, father is not considered a pedophile.

a sex offender is the reason that his daughters are presently in state custody, and, although we might surmise that they have suffered emotionally or developmentally as a result, we can only reiterate that the record is devoid of any facts demonstrating that father's conduct or condition has been seriously detrimental to either child.

The state argues that ORS 419B.504 authorizes the termination of parental rights on a showing of sexual conduct with *any* child. The state is correct. This court has consistently held that a child does not have to remain in an abusive environment until the state can show abuse of that particular child. *See, e.g., State ex rel Juv. Dept. v. Gohranson*, 143 Or App 36, 42, 923 P2d 1259, *rev den* 324 Or 395 (1996) (evidence that father sexually abused one of his children was properly considered in termination of parental rights as to victim's siblings); *State ex rel Juv. Dept. v. Miglioretto*, 88 Or App 126, 744 P2d 298 (1987) (same). Here, however, the state has presented no evidence that father's home was an abusive environment, and, though father has never resided with Bryanna, he did reside with Gina for a time with no indication of abuse. Additionally, according to the record, father's six- to seven-year-old son from another relationship maintained a bedroom in father's home, again with no indication of abuse. Indeed, SOSCF was well aware of this fact but took no action to prevent it, suggesting that SOSCF was not concerned that the child was at risk of abuse.

The state's argument appears to be that, because father is a sex offender who had sexual contact with teenage females, we should infer that father is a threat to his daughters. On this record, we are unwilling to draw such an inference. In *Gohranson* and *Miglioretto*, the fathers repeatedly victimized their own children in the home. Father's conduct is not comparable. The record shows that, before parents were married, and before Bryanna or Gina was born, father pursued relationships with sexually active teenage females. Although that conduct is egregious, the state has failed to show by clear and convincing evidence that it has been seriously detrimental to Bryanna or Gina.

Even if we were to assume that father's past sexual conduct, and his status as a sex offender, satisfy the first element of ORS 419B.504, the state has failed to demonstrate

that the integration of the children into father's home is improbable within a reasonable time due to conduct or conditions not likely to change. At the heart of the parties' dispute over the second statutory element is the requirement for courts to consider whether the parent has failed to make a lasting adjustment "after reasonable efforts by available social agencies for such extended duration of time that it appears reasonable that no lasting adjustment can be effected." ORS 419B.504(5).

The state contends that SOSCF is obligated only to "recommend and encourage" the use of services that will assist a parent to reach a minimum level of adequacy. *See State ex rel Juv. Dept. v. H.*, 62 Or App 288, 291-92, 659 P2d 1027 (1983). We find the state's reliance on *State ex rel Juv. Dept. v. H.* misplaced. There, we referred to services offered to a parent by the agency such as visitation, parenting classes, *counseling* and a psychological evaluation. Here, the trial court found that

> "[SO]SCF has provided father with no services—no parent training, financial assistance, no counseling, homemaking, or treatment service. Both mother and father requested financial assistance for the payment of the costs of father's sex offender treatment."

SOSCF appears to argue that, by making sex offender treatment a requirement for contact between father and his children, the agency has discharged its obligation to recommend and encourage the use of services. That argument fails.

Recently, we held that

> "[t]he state is required to make a reasonable effort to assist parents in making the adjustments to enable them to become minimally adequate parents. The type and sufficiency of efforts that the state is required to make and whether the types of actions it requires parents to make are reasonable depends on the particular circumstances." *State ex rel SOSCF v. Frazier*, 152 Or App 568, 582, 955 P2d 272, *rev den* 327 Or 305 (1998) (citations omitted).

Accordingly, we examine the particular circumstances of this case to determine if no effort at all by SOSCF was reasonable in this case. Our analysis of whether SOSCF has made reasonable efforts to help father make lasting adjustments

begins in June 1995, when the agency took custody of Bryanna, because it was from that moment on that father was faced with the possibility of having his parental rights terminated.

In *Frazier*, we held that the state was not obligated to provide required therapy at no cost where the record showed that father never requested assistance and had failed to take advantage of "significant opportunities to develop and demonstrate his parenting skills and to improve his mental condition." 152 Or App at 583. In contrast, the record here reflects that both father and mother repeatedly asked SOSCF for help in paying the cost of sex offender treatment and that SOSCF repeatedly denied their requests. In addition, father has shown a strong and consistent interest in becoming an adequate parental resource for his children. Father took steps to locate his daughter from a previous relationship, and he has maintained a parental relationship with his son from another relationship. In addition, father requested permission to attend his daughter's birth and participated in a subsequent family unity meeting. He voluntarily took part in group therapy while incarcerated and entered treatment three times with the stated goal of reunifying his family. Finally, he participated in visitation when SOSCF permitted it, and nothing in the visitation reports suggest that father is incapable of providing minimal care for his children.

The record before us indicates that father's financial resources were extremely limited. He was classified as indigent in December 1995. In July 1996, he was $345 behind in paying child support. In September 1996, he was $800 behind in his rent and delinquent on child support and treatment payments. The trial court found that each time father began treatment he was forced to quit due to his lack of financial resources. Most recently, father was unable to pay for treatment because of wage assignments to the state for the support of his children while they were in state custody. *See State ex rel Juv. Dept. v. Boren*, 105 Or App 599, 609, 806 P2d 149 (1991) (the state has the burden of establishing how much a parent with a meager income can reasonably be required to pay for care and maintenance of a child in state custody). Yet, the SOSCF caseworker responsible for father's

children was unaware that the state was garnishing both parents' wages for child support.

The record supports the trial court's finding that the cost of treatment presents an insurmountable barrier to the integration of children into father's home. If sex offender treatment is a requirement for family reunification, then it follows that a realistic reunification plan must provide an opportunity for the parent to complete the required treatment successfully. Based on the particular circumstances of this case, we conclude that SOSCF failed to make reasonable efforts in assisting father to make the lasting adjustments necessary to integrate his children into his home. For the reasons discussed above, we hold that the trial court did not err in denying the state's termination petitions.

Affirmed.