Argued and submitted March 18, reversed and remanded August 3, petition for
review denied October 20, 2011 (351 Or 254)

In the Matter of H. R.,
aka H. D. D.;
L. R., aka L. S. D.;
K. R., aka K. I. R.,
Children.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

H. L. R.
and K. D.,
*Appellants.*

Lane County Circuit Court
05261J, 06667J, 09095J
Petition Number 05261J06, 06667J04, 09095J03,
05261J07, 06667J05, 09095J04
A146514

260 P3d 787

Megan L. Jacquot argued the cause and filed the brief for appellant H. L. R.

James A. Palmer argued the cause and filed the brief for appellant K. D.

Inge D. Wells, Senior Assistant Attorney General, argued the cause for respondent. With her on the brief were John R. Kroger, Attorney General, and Mary H. Williams, Solicitor General.

Before Wollheim, Presiding Judge, and Brewer, Chief Judge, and Nakamoto, Judge.

NAKAMOTO, J.

## NAKAMOTO, J.

After a trial in 2010, mother and father appeal from judgments terminating their parental rights to their three children on the basis of unfitness. ORS 419B.504. On *de novo* review, ORS 19.415(3)(a),[1] we conclude that the trial court erred in terminating mother's and father's parental rights because the state did not prove by clear and convincing evidence that parents' conduct or conditions were seriously detrimental to the children. We thus reverse the judgments terminating their parental rights.

## I. FACTS

We state the relevant facts as we find them, with due regard to the trial court's findings as to the credibility of witnesses. *State ex rel Juv. Dept. v. Geist*, 310 Or 176, 194, 796 P2d 1193 (1990). We begin with background information regarding father and mother, their children, and the conflicts between mother and the Department of Human Services (DHS) regarding father's paternity and whether he posed a danger to the children. We then proceed to mother's history with DHS; father and his contacts with the children and, later, with DHS; the status of the children; and the trial court's ruling.

A. *Background*

Mother, H. L. R., and father, K. D., met in prison more than 10 years ago and have maintained a relationship in some form since that time. Mother was serving a sentence for her 1996 conviction of robbery and assault in the first degree, while father was serving a sentence for his 1999 conviction of two counts of attempted sex abuse in the first degree for touching the clothed breasts of an 11-year-old girl. Mother and father have three children together. They are H, a boy born in 2005; L, a girl born in 2006; and K, another girl, born in 2008.

Mother also has two older children, unrelated to father, whom she has never parented. They are not the subject of this case, but the removal of one of those children from

---

[1] "Upon an appeal from a judgment in a proceeding for the termination of parental rights, the Court of Appeals shall try the cause anew upon the record[.]"

mother's parents led DHS to contact mother around 2004. At that time, DHS evaluated mother to determine whether to place that child in mother's care. In 2005, while DHS was working with mother in regard to her older child, mother gave birth to H.

Starting in 2005, DHS suspected that K. D., a sex offender, was the biological father of H and, later, of L and K, despite mother's denials that he was the father of any of the children. In February 2007, at DHS's request, the juvenile court ordered paternity testing so that DHS could determine whether he was indeed the father, despite mother's denials. Nothing in the record indicates that DHS followed through and completed paternity testing as to father and any of the children at any time before 2009.

In the meantime, DHS maintained that father was a threat to H and then L and K because of his sex offender status, and DHS directed mother to have no contact with him. Mother, however, did not believe and denied that father was a threat. She repeatedly defied DHS by maintaining her relationship with father and lying to DHS caseworkers concerning that relationship. Later, she allowed the children to have contact with father, contrary to DHS directives. Father, meanwhile, knew he was the father of the children but did not contact DHS and claim that he was the father until 2009.

In large part, mother's decision to remain in a relationship with father and to allow father to have a relationship with the children resulted in DHS removing H and the other children from mother's care at various points between 2005 and 2009. Ultimately, after all three children had been removed from mother and after father's paternity was established, a DHS evaluator concluded in 2009 that father was a low risk for sexually abusing his or any other children.

B.  *Mother and removals of the children from her care*

DHS first removed H from mother at his birth in 2005 based on concerns about mother's previous criminal conviction; her mental health; and her relationship with a registered sex offender, father. Mother's 1996 criminal conviction was based on her stealing a purse and cutting a man in the neck with a box cutter when he confronted her as she

fled. In two psychological evaluations of mother that DHS arranged in late 2004 and early 2005 in regard to her older child, mother was diagnosed with a personality disorder not otherwise specified, with antisocial and narcissistic traits. Both evaluators found that her prognosis was poor until she could recognize concerns held by DHS and accept some personal responsibility for her situation.

As for mother's relationship with father, she denied to DHS that he was H's father or that she had contact with father. But DHS learned from mother's probation officer that mother had lied about having no contact with father and that he was probably H's father. DHS also contacted father's probation officer to explore the matter of his paternity and learned that father had previously told his probation officer that he was going to be a father, but identified someone other than H. L. R. as the mother. Father's probation officer was skeptical of father's claim that H. L. R. was not the mother of his child.

While H was in state custody, mother engaged in therapy and other services DHS provided. In early 2006, when H was over nine months old, DHS placed him in mother's care. H remained in mother's care for about 10 months, until DHS removed H again in late 2006 because mother failed to advise DHS that she was pregnant again. DHS was concerned that mother was having ongoing contact with father.

Within a few weeks of H's second removal from mother, L was born and was immediately removed from mother's care because "she was having ongoing contact" with father and "her mental health was not stable at the time." Mother, though, continued to deny to DHS that K. D. was the father of H or of L. Mother admitted that she hid her pregnancy from DHS because "she had felt threatened because she already had so little contact with her children." According to mother, her refusal to disclose her pregnancy to DHS led to a more hostile relationship with the caseworker.

Mother has completed a "non-offending parent" class, which educates parents who have been in a relationship with a sex offender about threats of harm that such a person may pose to a child and how to keep the child safe. She

also participated in individual counseling. In the spring of 2007, a psychologist evaluator, Sorensen, noted that mother nevertheless remained angry and resistant to accepting oversight and monitoring by DHS. In his opinion, mother had an antisocial personality disorder and, in general, in individuals with an antisocial personality "[m]arked distrust, a lack of empathy, and irresponsibility impair relationship development. Substance abuse, reckless behavior, and even criminal involvement also present concerns for this population." But, Sorensen found "no direct evidence to indicate a specific inappropriate, illegal, or dangerous action" by mother that was harmful to her children and could not say that mother's "self-focus" will result in harm or threat of harm to children in her care. Sorensen noted that no one had reported danger to the children during mother's visits and that he saw "little reason to continue strict restrictions regarding her visitation." He also suggested leaving it up to mother and her therapist to determine whether she wanted to continue counseling.

Thereafter, in 2008, DHS placed L, who was almost 18 months old, with mother and returned H, who was three years old, to her. Mother's therapist noted that she believed that mother had "learned techniques for keeping [H and L] safe from outside influences in the parenting program." All home visits went well and the "children appear[ed] healthy and reasonably well adjusted." In June 2008, DHS was satisfied with mother's progress and dismissed jurisdiction over H and L.

In late 2008, mother gave birth to K, a pregnancy that she had not disclosed to DHS before the dismissal of jurisdiction over H and L. Of the three children, K was the only one DHS did not remove from mother at birth. In December 2008, a teacher and special education coordinator with the Relief Nursery visited mother and all three children and noted that they were doing well. According to their report, mother's "house appeared clean[,] tidy[,] and safe [and] * * * the kids have books and art supplies easily accessible and clean up when asked." Mother "was very engaged with the kids and attentive[. She] set appropriate limits and followed through with consequences and praise." In regard to H, their report noted that he "has met most of his goals and we had to think a bit to come up with new ones. [H] is doing

especially well with social/peer interaction and cognitive skills."

In early 2009, though, DHS learned that mother faced possible eviction from her apartment because father was reported to be on the public housing property against a federal policy that bans all convicted sex offenders. DHS went to the home and observed blankets mother had hung up inside the otherwise clean apartment, which mother said was due to her fear of a neighbor who was harassing her. DHS removed all three children based on concerns about mother's mental health and DHS's ongoing suspicion that mother was having contact with father. The children showed no signs of abuse or neglect.

After DHS removed the children in February 2009, mother finally acknowledged father's paternity. Sorensen conducted another assessment of mother, who was then 38 years old, in the summer of 2009. He noted that DHS believed that father and mother were more involved with each other than mother described. Mother admitted that she allowed father to visit the children, including having unsupervised contact with them. Her dishonesty with DHS and the construction of a website critical of DHS, Sorensen noted, demonstrated mother's poor judgment and failure to sustain her focus on child protection. Sorensen determined that while "there is no evidence that [mother] will behave in a way that is dangerous to her children during brief contact with them, she appears unwilling to modify her willingness to sustain separation from a man believed to present a serious risk to their welfare."

In mother's final psychological evaluation just before the termination trial in May 2010, again with Sorensen, mother was reported to be "doing well" with her children, but she continued to have a hostile relationship with DHS. Mother would not follow DHS instructions to bring nutritious snacks to visitations, and DHS criticized mother for bringing a video to watch during a supervised visit. Additionally, mother spoke critically of DHS in front of the children. Further, according to Sorensen, DHS described mother as "highly focused on identifying evidence of maltreatment by foster parents" and again noted the website that "lashes out"

at child welfare agencies. Sorensen's evaluation predicted "with considerable confidence that she will continue to act without much interest in following future [DHS] directives" to refrain from any contact with father.

In all three evaluations Sorensen conducted of mother while the children were in state care, in 2007, 2009, and 2010, he reported that mother's involvement with DHS was "largely due to her continued relationship with a known sexual offender," *i.e.*, father. Additionally, based in significant part upon mother's continued cover up of her relationship with father and her resistance to accepting DHS monitoring and demands, Sorensen consistently diagnosed mother with an antisocial personality disorder.

At trial, Sorensen testified, in regard to mother's ongoing relationship with father, that Sorensen had "serious concerns about her ability to have some assessment of how well somebody is functioning." But Sorensen then acknowledged that for all of his evaluations of mother, DHS had informed Sorensen that mother "was having a dangerous person around her children[,] i.e., [father]," who was an untreated sex offender. Sorensen also said that he did not know at the time of his May 2010 evaluation of mother that father's sex offender treatment provider and a psychologist who evaluated father in 2009, Colistro, were of the opinion that father did not need further sex offender treatment.

Basham, a psychologist who evaluated mother in 2005 with regard to her older child, concluded provisionally at that time that mother had a personality disorder not otherwise specified, with antisocial and narcissistic features. He testified at trial that someone with mother's diagnosis is not *per se* unable to be an adequate parent; "it is possible someone could have that diagnosis and still be capable of parenting." He also acknowledged that if father were not in fact a danger to the children, then mother's reduced ability to protect them based on her diagnosis "is much less relevant" or is "not a relevant issue." And, Basham noted that individuals with personality disorders can and do change, particularly with age and maturity: "by middle age, many of the personality disorders kind of—it's kind of like they fade out. They just become less severe or less manifest in behavior. That's

generally accepted to be true of antisocial, that it declines; particularly the behavioral signs of that in middle age."

In summary, mother was aware of DHS's position that father was a threat to the children due to his 1999 sex abuse conviction; but, she did not agree he was a threat and consistently lied to DHS about her ongoing contact and relationship with him. Mother completed services required by DHS and consistently attended supervised visits with her children when they were placed out of her care, but she remained very defensive towards DHS. Mother's housing has appeared relatively stable except for her conflict with neighbors and property management that culminated in the threat of eviction for allowing father to be present on public housing property. Mother has not been arrested, charged, or convicted for any crime following her release from incarceration for her 1996 conviction. The record contains no evidence of any domestic violence, substance abuse, or additional safety concerns as to mother, other than DHS's concerns about mother's continued contact with the children's father and her resistance to DHS involvement.

C. *Father and his contacts with the children and DHS*

During post-prison supervision, for over three years from 2002 to 2005, father participated in, but did not complete, sex offender treatment. His sex offender treatment provider did not consider him a child predator because there was no evidence of pedophilia, or "a pattern of reoccurring interests for or behaviors with prepubescent children." Although he was not considered to be predatory and community notification was not required, he was still ordered not to have contact with minors. Father did have some contact with minors and violated some other conditions, such as viewing adult female pornography, during his post-prison supervision, which expired in 2005, several months after H was born. As required, father continues to register as a sex offender, but he has no ongoing limitations on the individuals with whom he may have contact or where he can live.

Father, it appears, has had a stable residence since 2004. Except for the call to father's probation officer in 2005, DHS did not contact or attempt to verify whether K. D. was the biological father of the children until 2009. At the same

time, he was aware that he was the father of the children and did not seek to establish paternity or request assistance from DHS in doing so until February 2009. Father, thus, was not legally identified or offered any services before 2009.

When the three children were removed from mother in February 2009, father was not allowed visitations until paternity could be established. DHS scheduled the paternity test for late April, but father then sought and completed a private paternity test that allowed his child visitations to start in April 2009. After his paternity was established, father was limited to solo supervised visits with the children. DHS denied the parents' request to have shared visits with the children because "all throughout the history of the case, we had told [mother] that she should not be having contact with him and we had no intention of them planning on visiting the children together, so we were not going to have their visits be together." DHS made it clear that it would not approve a plan that involved mother and father parenting together.

Father completed two psychological evaluations, one in 2009 and the second in 2010. In 2009, Colistro, a psychologist with experience evaluating and treating sex offenders, evaluated father at DHS's request. Colistro found father posed a "low risk for sexual recidivism with respect to his children in particular or other children in general. There is no need to re[-]involve him in sex offender treatment at this time." Thus, both his sex offender treatment provider and a psychologist indicated that there was no need for father to have further sexual offender treatment. Father has not reoffended or been arrested, charged, or convicted for any additional crimes since the 1999 conviction.

Colistro diagnosed father with a personality disorder with antisocial and narcissistic traits; although, as Colistro acknowledged, father had no juvenile record, had worked during high school, had served over five years in the military without any known problems, and then worked until suffering an injury. According to Colistro, father's primary risk to H, L, and K is due to his "negative attitudes toward external intervention," his personality disorder, and his relationship with mother because of her personality disorder. His

2009 evaluation report indicated that an antisocial lifestyle is a strong "predictor of violent recidivism" and that father's "personality disorder is a serious condition which has led him to make decisions of a self-destructive nature and to behave in ways that are harmful to others." Colistro recommended that father "should be allowed visitations only in a supervised setting," because father will probably continue to pursue a relationship with mother and "[g]iven that conclusion, * * * the children could be at risk of being in the presence of two character disordered parental figures" and "the likelihood that [father] will engage in some form of seriously self-destructive behavior that could be harmful to the children is substantial." At trial, Colistro testified that children in father's care would be at risk for becoming "the victim of some form of impulsive, neglectful behavior or perhaps more deliberate aggressive behavior if they were to say challenge" father. But Colistro had never seen father interact with his children, and he was unaware of any conduct by father that was impulsive towards his children or otherwise detrimental to them.

In 2010, psychologist Truhn diagnosed father with "Personality Disorder NOS with Antisocial, Narcissistic, and Paranoid Features." As to the additional element of "paranoid features," not included in father's 2009 diagnosis, Truhn said at trial that those "might" affect father's ability to care for his children due to his lack of insight as to how his behavior affects others and his difficulty in working with service providers. Truhn testified that father's diagnosis is based upon his history of deceitfulness and intimidation toward DHS and his "criminal types of behavior." He described father as being "angry with DHS." Truhn said that "[i]ndividuals with personality disorders have a tendency to meet their own needs rather than being able to place their children's needs above their own." Additionally, he said that father's prognosis was poor because he has "chosen to enter into what seems to be a power struggle in the relationship with DHS." Truhn recommended that father attend group therapy regarding his personality traits. DHS described father as having an intimidating personality. Father expressed anger that the foster parents repeatedly brought children to visits late, and that children were allowed to call

the foster parents "mom" and "dad." Also, father expressed dissatisfaction with a school counselor in a derogatory manner and requested a different therapist become involved. Although father would use profanity, he never threatened anyone with physical harm. The record contains no evidence of father abusing any of the children, any violence by father, domestic or otherwise, or any substance abuse problem that required treatment or that was detrimental to the children.

On his own initiative, father completed an eight-week parenting class where the instructor described him as a "good participant [and demonstrated] some understanding of kids' developmental levels." Father also sought an evaluation for group therapy services, but it does not appear that treatment was prescribed. Father attended all visits allowed by DHS and acted appropriately during them.

D. *The status of the children*

The record contains little information about the three children. A Comprehensive Mental Health Assessment for H was completed in May 2008 but there are no assessments for the two younger girls, L and K. From the evidence in the record, we know that all three children are bonded with both mother and father, and there are several third-party observations of positive interactions between both parents and with the children. As noted earlier, when DHS removed the children from mother for the final time, they did not appear neglected or abused.

In 2009, DHS first placed all three children in a Spanish-speaking foster home where minimal English was spoken. While in this foster home, the children received various bruises, scratches, infections, and a couple of black eyes that mother and father alleged were evidence of abuse. Around five months later, DHS moved the children to a second foster home, and their current potential adoptive placement. When H and L arrived at the second foster home, they "barely spoke." L also had a severe diaper rash with a staph infection, but that was resolved as were K's acid reflux issues that she had as a baby.

H has also resolved his previous speech delays and does not require special education going forward. As

expected, from his repeated removal from mother and foster homes, H previously experienced an adjustment disorder with depression and anxiety. Additionally, L is no longer considered overweight and has mostly resolved her speech delay, but may stutter when placed in a stressful situation. The foster mother reported at trial that all three children were "normal" and doing very well developmentally.

None of mother's and father's evaluators observed either parent interact with their children or observed the children themselves. Instead, the psychologists primarily described people with personality disorders, such as mother and father, generally, and their potential to have deleterious effects on their children as they parent, *e.g.*, a parent with a narcissistic personality trait is more focused on the parent's own needs instead of the children's needs, and a parent's intimidation of children can blunt their emotional development and put them at risk for depression and anxiety. According to the evaluators, a parent with an antisocial personality disorder or antisocial trait can demonstrate a pattern of irresponsibility, rejection of conventional rules, increased conflict, and deceitfulness, all of which can create instability that may impact the children's access to support systems. In addition, the parent may teach the children to share the same behaviors or create anxiety, depression, or lack of trust in the children that can lead to oppositional defiance. Further, the parent may expose children to danger and not be willing to accept input from professionals about that danger. In sum, the evaluators recognized the *potential* that parent's conditions could cause harm to the children in the future.

None of the evaluators assessed both mother and father, but Colistro said in his report that the combination of their personality disorders was a "recipe for disaster, both from a marital and parenting perspective." We could not find any evidence in the record, though, that the parents' conditions caused any actual harm to the children. The psychologist who evaluated father in 2010, for instance, said that the children did not show any characteristics that might occur from being around intimidating parents. Moreover, Sorensen testified that a diagnosis of personality disorder "is not a measure of parenting." When asked whether his predictions

of future effects of mother's diagnosis on her parenting were "made to a reasonable medical certainty," Sorensen noted that he could not "say for certain that future events will take place" and that "reasonable medical sufficiency" relates typically to "a current diagnosis, current condition, current functioning" and not to "predictions related to the future, which is inherently difficult to do."

E.   *The trial court's decision*

After Colistro found that father was at low risk for sexually abusing his children or any children, DHS focused less on father's sexual offender status and more on mother's and father's personality disorders, mother's lies about father's paternity and his involvement with mother and the children, and father's failure to come forward as the children's father. DHS contended that these factors rendered them unfit to parent, especially when their personality disorders are considered in combination in a dual-parent relationship.

The trial court found that the state had established by clear and convincing evidence that mother and father are unfit by reason of conduct or conditions seriously detrimental to the children and that integration into the home is improbable within a reasonable time. The trial court concluded mother was unfit due to her antisocial personality disorder, resistance to treatment, and because she lied about not having contact with father, a convicted sex offender. Because mother did not testify, the state's evidence from all three psychological evaluators regarding mother and their conclusions that "personality disorders are essentially not a treatable condition" were unrefuted.

With regard to father, the trial court concluded that he was unfit due to his personality disorder with antisocial, narcissistic, and paranoid features. Also, as a convicted sex offender, in the past he had violated a condition of his probation by having contact with children and by failing to complete sex offender treatment. We also note that father did not testify.

The trial court concluded that available social agencies had provided reasonable services for both mother and

father, but that the parents' emotional and mental disorders are of such nature and duration as to render them incapable of providing care for the children for extended periods of time; they failed to make efforts to adjust their circumstances, conduct, or conditions; they had failed to learn sufficient parenting skills to safely care for the children; and neither had provided a viable plan that would allow return of the children. The trial court then ruled that it was in the children's best interests to terminate mother's and father's parental rights.

## II. DISCUSSION

A. *Legal standards*

The statute governing termination of parental rights for unfitness is ORS 419B.504. The Supreme Court has interpreted ORS 419B.504 and held that both parts of a two-part test must be met before the court orders termination:

> "First, the court must address a parent's fitness: The court must find that the parent is 'unfit by reason of conduct or condition seriously detrimental to the child.' That, in turn, requires a two-part inquiry: The court must find that: (1) the parent has engaged in some conduct or is characterized by some condition; and (2) the conduct or condition is 'seriously detrimental' to the child. Second—and only if the parent has met the foregoing criteria—the court also must find that the 'integration of the child into the home of the parent * * * is improbable within a reasonable time due to conduct or conditions not likely to change.' "

*State ex rel SOSCF v. Stillman*, 333 Or 135, 145, 36 P3d 490 (2001); *see also State ex rel Dept. of Human Services v. Smith*, 338 Or 58, 80-81, 106 P3d 627 (2005).

The state must establish statutory grounds for termination by clear and convincing evidence, meaning that the record must disclose evidence that makes it highly probable that the parents are not presently able, and will not be able within a reasonable time, to meet their children's physical and emotional needs. ORS 419B.521(1); *Smith*, 338 Or at 79-80. Evidence is clear and convincing when it makes the existence of a fact "highly probable" or when it is of "extraordinary persuasiveness." *State ex rel Dept. of Human Services v. Hinds*, 191 Or App 78, 84, 81 P3d 99 (2003).

We must focus on the detrimental effect of the parent's conduct or condition on the child, not the seriousness of the parent's conduct or condition in the abstract. *Stillman,* 333 Or at 146. Thus, the state must prove that some combination of the parent's conduct or conditions is seriously detrimental to that particular child. *State ex rel Dept. of Human Services v. Rodgers,* 204 Or App 198, 217-18, 129 P3d 243 (2006) (citing *State ex rel SOSCF v. Mellor,* 181 Or App 468, 476, 47 P3d 19 (2002), *rev den,* 335 Or 217 (2003)). In other words, the inquiry is "child-specific" and calls for "testimony in psychological and developmental terms regarding the particular child's requirements." *State ex rel Dept. of Human Services v. Huston,* 203 Or App 640, 657, 126 P3d 710 (2006). Further, clear and convincing evidence of unfitness must exist at the time of the termination hearing; past unfitness is insufficient. *Id.* at 654. After satisfaction of the above test, the court must also find that termination of the parental rights is in the best interests of the child. ORS 419B.500.

## B.   *Conduct or conditions of the parents*

On appeal, DHS combines their argument that both mother and father were unfit at the time of the termination trial due to antisocial personality disorders that are untreatable and unlikely to change. Additionally, DHS argues, mother cannot conform or adjust her circumstances because she repeatedly lied about her relationship with father. Further, by failing to come forward before February 2009, DHS contends that father demonstrated a lack of effort to adjust his circumstances to allow the return of the children. We conclude that mother and father have engaged in conduct or have conditions that must be examined for adverse effects on their children.

### 1.   *Mother's personality disorder and lying*

Mother did not rebut the expert evidence that she has a personality disorder. And, the state proved by clear and convincing evidence that mother lied to DHS about her ongoing contacts with father and father's contacts with the children. Thus, mother's conduct or conditions on at least those grounds are established by clear and convincing evidence.

As to mother's failure to effect a lasting adjustment, ORS 419B.504(5), which DHS contends was caused by her dishonesty, we understand DHS to contend that (1) mother lied to cover up her persistent contact with father, presenting a danger to the children; and (2) mother's lies about father's paternity interfered with DHS's ability to investigate and involve father as a parental resource for the children. Because DHS identifies potentially detrimental conduct by or conditions of mother and not merely mother's failure to change, we need not reach mother's legal argument that failure to change cannot by itself be considered as conduct or a condition of the parent for purposes of unfitness under *State ex rel Dept. of Human Services v. Rardin*, 340 Or 436, 134 P3d 940 (2006).

We agree that the state proved that mother lied to DHS repeatedly, both about her contact with father and about father's paternity. We discuss the effect of mother's lies and her personality disorder later in this opinion, in the analysis regarding detriment to the children.

2. *Father's personality disorder and failure to establish paternity until 2009*

Father, as he did at trial, questions his personality disorder and argues that the state did not prove this condition by clear and convincing evidence. *See State ex rel Dept. of Human Services v. L. S.*, 211 Or App 221, 242, 154 P3d 148 (2007) (father found not unfit when personality disorder was diagnosed for anger and distrust toward DHS following more than "two years of participating in services required by DHS that did not seem to be bringing him any closer to reuniting with his child"). The evaluators observed that the relationship between father and DHS has developed into a "power struggle," that father expressed anger and frustration regarding DHS involvement, and that he demonstrated a resistance to trust DHS and its agents, but father attempted to establish at trial that there were reasons for father's reactions. DHS made clear starting in 2005 that father was not to have contact with the children or mother, and when the state requested a paternity test for father in 2007, the admitted goal was not to "work with" father, but to prove that mother was untruthful regarding her contact with father in order to

continue jurisdiction over the children. When DHS removed the children from mother in 2009 because of contact with father, DHS refused to provide father with services or supervised visitation because a paternity test had not yet established that he was the legal father. Father was refused additional supervised visits and co-visits with mother after he was found to be a low risk for sexual abuse. He received no services from DHS other than supervised visits, but he sought services himself to establish that he was ready to parent. And, the evidence suggests that he had reason to believe that his children were physically abused in one of their foster homes. Father also notes that portions of Colistro's own report contradict his diagnosis. Colistro gave father a psychological test, the Million Clinical Multiaxial Inventory, in 2009 that showed "no indications of major mental, emotional or characterologic disturbance" and that "[a]bsent from the profile are any indications of significant antisocial proclivities or predisposition to substance abuse."

Father did not provide expert testimony to contravene the psychologists who testified for DHS, and neither psychologist retracted his diagnosis that father has a personality disorder or admitted doubt about the diagnosis. The trial court credited and relied on the testimony of the psychologists who evaluated and diagnosed father. Although it is a close question, given that testimony, we conclude that the state proved by clear and convincing evidence that father has a personality disorder.

On appeal, DHS also argues that father demonstrated a lack of effort to adjust his circumstances because he never came forward before 2009 to demand a paternity test and legal recognition of his relationship to the children. Although the state proved that father did not come forward to claim paternity before 2009, when mother admitted to DHS that he was the father of the children, we do not agree that his request for a paternity test in 2009 is conduct or a condition demonstrating unfitness under the facts of this case and the Supreme Court's decision in *Rardin*, 340 Or 436.

In this case, starting in 2005, DHS strongly suspected that mother and father were in an ongoing relationship and that father was the biological father of H, and subsequently also of L and K, following their respective births

and removals from mother. DHS at various points, particularly when DHS removed the children, believed that father was having contact with the children. The evidence at trial established that father had a parental relationship with his children before he established legal paternity in 2009. Father could have requested a paternity test before 2009 but does not appear to have done so. Rather, DHS for years had told mother directly, and let father know indirectly, that DHS did not consider father to be safe around any children, much less an appropriate parent for mother's children. Although the state blames mother and father for failing to involve father with DHS, we note that DHS in fact had sought and received a court order allowing paternity testing of father in 2007 and so could have done so itself. Yet there was no evidence that DHS contacted father for testing, offered services to him if he were proven to be the father, or that it established father as the biological father of any of the children until 2009, when mother admitted father's paternity and father arranged for a paternity test. DHS thus never obligated itself to provide father with services. Under these circumstances, we conclude based on *Rardin* that father's failure to establish a legal relationship to the children is not, in itself, a condition or conduct of father under ORS 419B.504 that would constitute grounds to establish his unfitness.

In *Rardin*, the father signed a birth certificate indicating he was the father of a child born in 1995. 340 Or at 438. He was involved with the child during her infancy, but then his relationship with the mother ended. *Id.* at 439. Later, the child was placed in state custody at various points between 1997 and 2001 because of the mother's drug abuse. *Id.* In 1999, DHS contacted the father, but he declined to be involved absent a paternity test proving that he was the child's father after the mother had told him he was not. *Id.* Neither the father nor DHS paid for the expensive paternity test. *Id.* In 2002, DHS decided to terminate his parental rights, before it provided services to the father to enable him to take custody of the child, and then denied the father direct contact with the child. *Id.* at 440. The father then obtained his own paternity test, established his legal status as the father, and opposed the termination petition, which, among other things, was grounded on allegations of unfitness

because he had failed to present a viable plan for the child's return to his care. *Id.*

The trial court determined that the father's contact had come so late that the child was not prepared to accept him as a parent and that the father's choices had resulted in the lack of a parent-child relationship. *Id.* at 441. That, in turn, made the father unable to present a viable plan for placement of the child in his care in the trial court's view. *Id.* On appeal, we agreed that the father's conduct had allowed the child to languish in an unsafe environment with the mother and that his voluntary absence from the child's life from 1996 to 2002 were conditions that made him unfit. *Id.* at 442. The Supreme Court reversed and held that the father's failure to establish a legal and parental relationship with his child absent a paternity test, which he did not obtain until DHS informed him that his parental rights would be terminated, was not the kind of directly harmful or threatening behavior that provides grounds for unfitness under ORS 419B.504. *Id.* at 445-46.

In this case, unlike the father in *Rardin*, father had an established parental relationship with his children, but DHS directed that father have nothing to do with mother and the children. As in *Rardin*, DHS was aware of the likelihood that father was the children's biological father. DHS was aware of father's contacts with mother and the children, suspected he was the biological father, and had obtained a court order for paternity testing of father. Father's failure to establish his legal relationship to the children in the face of DHS's opposition to his parental relationship does not establish legal grounds for unfitness under ORS 419B.504.

## C. *No serious detriment to the children*

DHS admits that all three children were doing "reasonably well" at the time of the termination trial and that the risk of father sexually abusing the children was low. However, DHS contends that the combination of mother's and father's personality disorders places the children at risk and that it is "highly likely that they will end up back in foster care." Further, DHS argues that mother's dishonesty regarding father's paternity and her relationship with him

and father's failure to become involved with DHS until 2009 is detrimental to the children. Under the totality of the circumstances, DHS argues, both mother and father are presently unfit. *See State ex rel Dept. of Human Services v. J. A. C.*, 216 Or App 268, 277, 172 P3d 295 (2007) ("All proven conduct or conditions will be viewed in combination in determining whether a parent is unfit."). We do not find clear and convincing evidence of serious detriment to the children as a result of parents' conduct and conditions.

With regard to mother's antisocial personality disorder diagnosis, such a condition does not make a parent automatically unfit. A parent can be "inflexible, over-controlled, self-centered, and overly desirous of appearing in a positive light," but the state must still provide clear and convincing evidence that the disorder had a seriously detrimental effect on the child at the time of the hearing. *State ex rel Dept. of Human Services v. Simmons*, 342 Or 76, 100, 149 P3d 1124 (2006). Basham, one of the psychologists, also acknowledged that people with personality disorders can parent. In this case, there was no evidence that mother harmed her children, and Sorensen noted that he believed she would not harm the children. Rather, the focus was on mother's exposure of the children to their father.

The psychologists appeared to consider mother's judgment that father was not a threat to the children to be both a sign and a symptom of mother's personality disorder. In 2009, DHS completed an evaluation of father that proved mother's judgment to be correct. Assuming mother's antisocial personality disorder caused mother to disagree with DHS, as opposed to crediting mother with the means and ability to assess the risk father posed, mother's disagreement with DHS is insufficient to prove that her condition caused serious detriment to the children and rendered her unfit. Because DHS's belief that father posed a serious danger of sexually abusing the children was proven false, Basham testified that mother's reduced ability to protect them based on her diagnosis "is much less relevant" or is "not a relevant issue." And, as Basham testified, individuals with personality orders can and do change, particularly with age and maturity.

DHS also contends that mother's lying and antagonism towards DHS was seriously detrimental to the children because it "prevented them from settling into a permanent home." Boiled down, however, DHS's argument is that because mother lied to and defied DHS, DHS determined that the children should remain in the state's protective custody—not that mother had harmed the children. That argument is undercut by the Supreme Court's previous determination that hostility and untruthfulness toward DHS, without more, is not sufficient evidence of a conduct or condition detrimental to the children. *Smith*, 338 Or at 85-87 (in absence of clear and convincing evidence that mother's tendency to lie and tell outrageous stories is seriously detrimental to child, mother's untruthfulness not grounds for termination). Upon examination, we find that mother's conduct or condition has had the direct effect of allowing the children to form a bond with their father, against DHS instructions, but that the state failed to establish that she had harmed the children. We do not find that DHS's concerns about mother's parenting abilities rise to the level of "extraordinary persuasiveness" that mother's condition or conduct is seriously detrimental to the children. Thus, the state failed to prove that mother was unfit at the time of trial.

As for father, the state failed to provide clear and convincing evidence that his personality disorder had a direct detrimental effect on any of the children. The evidence suggests the contrary. The state admits that father has been involved with the children in a parental relationship, contrary to DHS's efforts to keep the children away from father, and evidence establishes that the children are all bonded with father. Although the evaluators predict that father's personality disorder will have a seriously detrimental effect on the children if he were to assume a parental relationship, especially with mother, father did parent the children, with mother's assistance, and the record contains no evidence that he had injured the children or that they had suffered harm due to his relationship with them. Instead, the evidence suggests that all three children are bonded with both father and mother, and third parties have observed positive interactions among them all. Father is not unfit without clear and convincing evidence that his conduct or condition is detrimental

to the children. *L. S.*, 211 Or App at 242-43 (parent behaved appropriately with child and no evidence that child was affected by parent's emotional problems). Even though Colistro predicted that father, with his personality disorder, would impulsively harm the children, other psychologists testified that people with personality disorders can parent and that predictions of future behavior, to a reasonable medical certainty, based on a diagnosis of a personality disorder cannot be done. The most significant actual detriment to the children that we can find was directly related to DHS's removal of the children, but the children currently appear to be doing well.

In response to the trial court's finding that father poses a risk to the children, father also argues that the state did not establish by clear and convincing evidence that his 1999 attempted sex abuse conviction created a detrimental risk to the children. On appeal, in light of Colistro's opinion, the state appears to abandon the argument that father's sex offender status presents a risk of harm to the children. That position is well taken. In the absence of "some nexus between the nature of the offender's prior offense and a risk to the child at issue," father's status as a sex offender does not constitute conduct or a condition severely detrimental to his children. *State ex rel Dept. of Human Services v. N. S.*, 229 Or App 151, 158, 211 P3d 293 (2009) (contact with an untreated sex offender is not *per se* dangerous to children; additional evidence must establish a risk to the particular child at issue); *accord State ex rel SOSCF v. Burke*, 164 Or App 178, 181-84, 188, 990 P2d 922 (1999), *rev den*, 330 Or 138 (2000). Accordingly, we do not agree that DHS should continue to restrict contact between mother and father and the children simply because that is what they had instructed "throughout the history of the case." DHS's own evaluation of father established that he was not a sexual threat to the children, thereby eliminating the original reason DHS put the restriction into place.

The Supreme Court has repeatedly noted that ORS 419B.504 contains a legislative assumption that parents can change their conduct, and that if change is genuine and lasting, the state may not terminate their parental rights.

*Simmons*, 342 Or at 103 n 13; *Rardin*, 340 Or at 447. We conclude that the state did not provide clear and convincing evidence that the conditions and conduct of mother and father were seriously detrimental to their children at the time of trial. Accordingly, the state failed to show by clear and convincing evidence that they are unfit under ORS 419B.504. The trial court's judgments terminating the parental rights of mother and of father were therefore error.

Reversed and remanded.